A. A. Gallagher Warehousing Corp. v. Commissioner. American Truck Rental Corp. v. Commissioner.A. A. Gallagher Warehousing Corp. v. CommissionerDocket Nos. 4870-62, 4871-62.United States Tax CourtT.C. Memo 1965-9; 1965 Tax Ct. Memo LEXIS 321; 24 T.C.M. (CCH) 38; T.C.M. (RIA) 65009; January 22, 1965Herman J. Obert, Fidelity-Philadelphia Trust Bldg., Philadelphia, Pa. for the petitioners. Stephen P. Cadden, for the respondent. WITHEYMemorandum Opinion WITHEY, Judge: The respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows: DocketDefi-No.YearciencyA. A. Gallagher Ware-housing Corp.4870-621958$ 2,315.30195912,248.55American Truck RentalCorp.4871-62195837,091.46The cases are consolidated herewith for decision. The sole issues presented for our decision are the correctness of the respondent's action in determining that (1) petitioner American Truck Rental Corp. received taxable long-term capital gain in the amount*322 of $145,661.99 during 1958 rather than nonrecognized gain from an involuntary conversion of property under section 1033 of the Internal Revenue Code of 1954; and (2) petitioner A. A. Gallagher Warehousing Corp. claimed excessive depreciation deductions in the amounts of $7,717.68 and $30,870.74 for 1958 and 1959, respectively. All of the facts have been stipulated and are hereby found as stipulated. Petitioner American Truck Rental Corp., sometimes hereinafter referred to as Rental, filed its income tax return for 1958 with the director at Philadelphia, Pennsylvania. Petitioner A. A. Gallagher Warehousing Corp., sometimes hereinafter referred to as Warehousing, filed its income tax returns for 1958 and 1959 with the director at Philadelphia, Pennsylvania. Issue 1. Involuntary Conversion American Truck Rental Corp. was organized on March 25, 1946, under the laws of the State of Pennsylvania. Its office and other facilities are located in the City of Philadelphia, Pennsylvania. Since its organization it has been engaged in the business of leasing, maintaining, storing, and repairing automobiles, trucks, trailers, and other vehicles. On December 31, 1958, Rental*323 had an authorized capitalization of $59,920. Its outstanding common stock on that date consisted of 150 shares having a paid-in value of $1,500, all of which were owned by Arthur A. Gallagher. The outstanding preferred stock of Rental during 1958 consisted of 5,842 shares of 6 percent cumulative preferred having a par value of $10 per share. During 1958 the outstanding preferred was held as follows: Immaculata Gallagher held 4,137 shares of the 6 percent cumulative preferred stock of which 155 shares were issued to her on December 28, 1948, 2,387 shares issued on December 29, 1948, 1,555 shares issued February 9, 1949, and 40 shares issued February 23, 1949. Arthur A. Gallagher, son of Immaculata Gallagher, was the holder of 155 shares of 6 percent cumulative preferred stock issued December 28, 1948. Each of the following children of Immaculata Gallagher, or their guardians in the case of minor children (Arthur A. Gallagher and his sister Rita Gallagher Yost being the guardians), held 155 shares of the 6 percent cumulative preferred stock issued on December 28, 1948, as follows: NameSharesRita Gallagher Yost155John Gallagher155Francis Gallagher155Anna Gallagher, minor155Jane Gallagher, minor155Helen Gallagher, minor155Immaculata Rita Gallagher155William Gallagher155Margaret Gallagher155Joseph Gallagher155*324 The board of directors of Rental during 1958 was comprised of Arthur A. Gallagher, his brother Francis Gallagher, and J. Earl Martin. Martin was unrelated to any of the members of the family of Immaculata Gallagher. The officers of Rental during 1958 were Arthur A. Gallagher, president, Francis Gallagher, vice president, and J. Earl Martin, secretary-treasurer. On October 17, 1947, Rental acquired 3,278 acres of vacant land located at Richmond and Roxborough Streets in the City of Philadelphia, at a cost of $16,009.93. The $16,009.93 amount used by Rental for the purchase of the property was advanced to it by Arthur A. Gallagher from his personal funds. Arthur A. Gallagher received stock in Rental in payment for the above-described advance. The property acquired by Rental on October 17, 1947, was used by it for the storing and repairing of automobiles, trucks, trailers, and other vehicles in connection with its regular business operations. During the years here pertinent, E. A. Gallagher and Sons, sometimes hereinafter referred to as the partnership, a copartnership consisting of Arthur A. Gallagher and the Estate of Edward A. Gallagher, deceased, was engaged in the business*325 of hauling, rigging, and warehousing. At all times here material Arthur A. Gallagher controlled the active management and business affairs of the partnership. Arthur A. Gallagher was the owner of a 15 percent interest in the partnership. The remaining 85 percent was owned by the Estate of Edward A. Gallagher, deceased, of which Arthur's mother, Immaculata Gallagher, was trustee. In the course of its business operations Rental rented trucks and rigging equipment to the partnership. Rental also stored heavy materials and automobiles for the partnership during 1958. The above-described vacant land acquired by Rental on October 17, 1947, was leased by it to the partnership for a period of 5 years beginning October 1, 1948, at an annual rental of $1,800. Leasehold improvements consisting of a cinderblock building, a corrugated iron building, and a frame office building were erected on the land by the partnership in 1955 at a total cost of $48,599.52. On December 19, 1951, the premises of Rental located at Richmond and Roxborough Streets in Philadelphia were condemned by the City of Philadelphia effective as of January 1, 1952. The City of Philadelphia took physical possession of the*326 property on or about February 1, 1955. The partnership information return filed by the partnership for 1955 discloses a claimed loss in the amount of $1,003.71 upon the disposition of the leasehold improvements during that year. 1From 1955 to 1958 the business of Rental was conducted from rented quarters located at Sixth and Clearfield Streets and also at Second and Erie Avenue in Philadelphia. Rental refused to accept the consideration offered by the City of Philadelphia for the condemnation of the property located at Richmond and Roxborough Streets and commenced litigation as to the amount of just compensation in the Court of Common Pleas for Philadelphia County. On October 17, 1957, a jury awarded Rental $166,117.22 as compensation for the taking of its property. In payment thereof Rental received during 1958 the following amounts from the City of Philadelphia. DatePrincipalInterestCostsTotal3- 7-58$104,300.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,817.223-21-58$1,596.943-21-58260.753-21-58$445.30$166,117.22$1,857.69$445.30$168,420.21*327 Prior to the receipt of any of the abovelisted payments during 1958, Rental's cash account had a balance of $989.17. A. A. Gallagher Warehousing Corp. was organized on July 10, 1952, under the laws of the State of Pennsylvania for the purpose of operating warehouses and conducting a general warehousing business. During the period July 10, 1952 to September 30, 1958, Warehousing did not engage in the active conduct of business. Its assets on January 1, 1958, consisted of notes and accounts receivable in the amount of $373.25 and organization expense of $126.75, totaling $500. The total assets were represented by 500 shares of Warehousing common stock which were issued to Arthur A. Gallagher at a cost of $500. On September 30, 1958, Warehousing acquired a tract of approximately 16 acres, containing piers, docks, vacant land, and buildings, located at Delaware Avenue and Tasker Street in Philadelphia. A substantial portion of the 16-acre tract acquired by Warehousing was river bottom suitable for dockage with some improvement. The property was purchased by Warehousing for $550,000 under two mortgages totaling that amount. Warehousing incurred additional expenses in connection with*328 the acquisition of the property amounting to $46,614.15. These acquisition expenses were paid by Warehousing to the extent of $20,364.15 during 1958 with funds derived from the repayment of loans and from advances previously made by Rental, Arthur A. Gallagher, and the partnership. The balance sheet of Warehousing as of December 31, 1958, further disclosed the following amounts as "Other Liabilities": Loans and advances payable: E. A. Gallagher and Sons$ 5,377.16American Truck Rental Corp.35,000.00Arthur A. Gallagher1,534.60$41,911.76On October 10, 1958, Rental acquired 80 percent of the stock of Warehousing by purchasing 300 shares of its stock from Arthur A. Gallagher for $300 and by acquiring 500 shares of newly-issued Warehousing stock. For the 500 newly-issued shares of Warehousing stock, Rental executed and delivered its demand note dated October 10, 1958, in the amount of $166,217.35. 2 Following these transactions the stock of Warehousing was owned 80 percent by Rental and 20 percent by Arthur A. Gallagher. On November 10, 1958, Warehousing borrowed $166,000 from the Broad Street Trust Company of Philadelphia. On November 10, 1958, and*329 November 13, 1958, Warehousing loaned a total of $166,217.50 to Rental for which Warehousing issued checks in the amounts of $165,500 and $717.50, respectively. On November 10, 1958, a noninterestbearing demand note in the amount of $166,217.35 was issued by Rental in favor of Warehousing for the above-mentioned loans made on the same date. No payment of either principal or interest has been made by Rental on the note issued on that date. On November 14, 1958, a check was drawn by Rental on the Broad Street Trust Company in favor of Warehousing in payment of the note which Rental previously had issued on October 10, 1958, in the amount of $166,217.50. On November 17, 1958, Warehousing issued its check in favor of the Broad Street Trust Company in the amount of $166,161.28 in payment of its loan in the amount of $166,000 made on November 10, 1958, plus $161.28 interest. After the above transactions were completed the books of Rental reflected an investment asset account in the amount of $166,217.50 representing the cost of 500 shares of Warehousing stock, offset by a liability account*330 represented by a non-interest-bearing note issued by Rental to Warehousing in the amount of $166,217.50. The books of Warehousing as of December 31, 1958, disclosed an asset account represented by a note due from Rental in the amount of $166,217.50 and, on the liability side, reflected paid-in surplus in the amount of $165,717.50, earned surplus of $1,026.12, and paid-in par value of $1,000 for 1,000 shares of its outstanding stock. Each of the above-mentioned checks and notes was signed by Arthur A. Gallagher as president of either Rental or Warehousing. Since the acquisition by Warehousing of the premises located at Delaware Avenue and Tasker Street in Philadelphia, the property has been used by Warehousing and Rental in the conduct of their respective business operations and has also been leased to the partnership. After the acquisition of the 80 percent stock interest of Warehousing by Rental, the property located at Delaware Avenue and Tasker Street was used for the same purposes as the condemned premises located at Richmond and Roxborough Streets. In its income tax return for 1958 Rental reported that its previously-owned property located at Richmond and Roxborough*331 Streets was condemned by the City of Philadelphia and that it received a condemnation award therefor in the amount of $166,117.22. It further stated on its 1958 return that it elected under section 1033 of the Code not to have the gain realized on the involuntary conversion of its premises recognized and accordingly had acquired 800 shares of the outstanding stock of Warehousing which owned property located at Delaware Avenue and Tasker Street. In his notice of deficiency mailed to Rental for 1958 the respondent determined that it had realized taxable long-term capital gain in the amount of $145,661.99 during 1958 resulting from the involuntary conversion of its property. The $145,661.99 gain realized by Rental was computed by respondent as follows: Condemnation award by City ofPhiladelphia$166,117.22Less: 1947 Cost of land$16,009.931958 Appraisal feespaid4,000.001958 Cost of manda-mus policy445.3020,455.23Gain realized by American TruckRental Corp.$145,661.99Section 1033(a)(3)(A) of the 1954 Code provides that where, as the result of*332 condemnation, property is involuntarily converted into money, the gain shall be recognized except that if for the purpose of replacing the property the taxpayer purchases other property or purchases stock in acquiring control of a corporation owning property similar or related in service or use to the property so converted, he is entitled to elect that the gain shall be recognized only to the extent that the amount realized from the involuntary conversion exceeds the cost of the newly-acquired stock or replacement property. 3*333 It is unquestioned that Rental made a proper and timely election on its return for 1958 to claim the benefits of section 1033(a) of the Code with respect to the gain in the amount of $145,661.99 resulting from the condemnation award received pursuant to the taking of its property located at Richmond and Roxborough Streets by the City of Philadelphia. Respondent further concedes on brief that after the acquisition by Rental of 800 shares of Warehousing stock on October 10, 1958, the property owned by Warehousing located at Delaware Avenue and Tasker Street was used for the same purposes as the condemned property located at Richmond and Roxborough Streets prior to its taking by the City of Philadelphia. The respondent contends, however, that the series of transactions leading up to and immediately following the acquisition by Rental of 800 shares of Warehousing stock during October and November 1958 were lacking in economic substance. He accordingly has taken the position that Rental did not make a bona fide investment of the conversion proceeds or their equivalent in the stock of Warehousing and therefore did not "purchase stock" in acquiring control of a corporation owning the*334 replacement property within the meaning of section 1033(a)(3)(A) of the 1954 Code. On brief the respondent explained his computation of recognizable gain to Rental resulting from the receipt of the conversion proceeds as follows: Gain from the involuntary conversion should, therefore, be recognized in full as capital gain,as follows: 1. Proceeds of condemnation award received by American TruckRental Corp.$166,117.22Less amount spent in purchase of stock in control of A. A. Gal-lagher Warehousing Corp., a corporation owning similar orrelated property.300 shares from Arthur A. Gallagher $300500 shares from A. A. Gallagher Warehousing Corp.500800.002. Unexpended conversion proceeds in American Truck Rental Corp.$165,317.223. Gain from conversion to American Truck Rental Corp.$145,661.994. Recognized capital gain of American Truck Rental Corp. in 1958(lesser of 2 or 3)$145,661.99The petitioner contends that Rental made a genuine investment of the conversion proceeds in acquiring control of Warehousing and that the fact that it borrowed funds from Warehousing in an amount equivalent to the note issued to that corporation*335 in connection with the acquisition of 500 shares of its stock does not negate nor adversely affect the nature of the purchase it claims to have made. In Filippini v. United States, 318 F. 2d 841, the Court of Appeals for the Ninth Circuit described the rationale of section 1033(a) as follows: The purpose of the statute is to relieve the taxpayer of unanticipated tax liability arising from involuntary condemnation of his property, by freeing him from such liability to the extent that he reestablishes his prior commitment of capital within the period provided by the statute. * * *The test is a practical one. The trier of fact must determine from all the circumstances whether the taxpayer has achieved a sufficient continuity of investment to justify non-recognition of the gain, or whether the differences in the relationship of the taxpayer to the two investments are such as to compel the conclusion that he has taken advantage of the condemnation to alter the nature of his investment for his own purposes. In the situation presented here it is difficult for us to believe*336 that Rental has effectively "re-established" its "prior commitment of capital" by investing the proceeds received from the condemnation award for the involuntary taking of its property in the capital stock of Warehousing. We must take cognizance at the outset of the vast disparity in the consideration purportedly paid for the 500 shares of newly-issued Warehousing stock as compared with the cost of the 300 shares previously outstanding and acquired from Arthur A. Gallagher. On October 10, 1958, Arthur A. Gallagher sold his 300 shares of Warehousing stock to Rental for $300, or $1 per share. On the same day, Rental issued to Warehousing its promissory note in the amount of $166,217.50 and acquired 500 newly-issued shares of Warehousing stock purportedly at a price per share of $332.43. The demand note issued by Rental to Warehousing for cash loans in the amount of $166,217.35 on November 10, 1958, bore no maturity date and made no provision for the payment of interest to Warehousing. Since the date of its issuance Rental has made no payment of either principal or interest on the note to Warehousing. The effect of the transaction was to permit Rental to retain indefinitely the full*337 use and possession of the $166,117.22 condemnation award. As a consequence of the interchange of notes and checks issued by Rental and Warehousing during October and November 1958, the parties utilized Warehousing merely as a conduit through which Rental routed the proceeds of the condemnation award by purportedly making payment for the 500 shares and then immediately borrowing from the subsidiary corporation the exact amount of the note and check given for the shares. Thus, Rental at all times here pertinent retained full control of the proceeds of the condemnation award and Warehousing never had more than the transitory possession thereof. The record indicates that the value of Warehousing's common stock during October and November of 1958 was not greater than $1 per share. Its acquisition of the replacement property located at Delaware Avenue and Tasker Street added nothing whatever to its net worth since that property was purchased entirely with mortgages equal to its purchase price of $550,000. Consequently we agree with the respondent that Rental at most paid no more than $500 for the 500 new shares issued by Warehousing, if in fact it paid anything at all. Rental has incurred*338 no financial obligation in connection with the acquisition of the Delaware Avenue and Tasker Street property inasmuch as the purchase money mortgages were executed by Warehousing. And, as indicated above, we are unable to find that Rental incurred any bona fide obligation by the issuance of its note on November 10, 1958, to pay Warehousing any consideration even remotely approaching the face amount of the note, or $166,217.35. In view of the great disparity between the purchase price paid by Rental for Arthur A. Gallagher's 300 shares of stock and that purportedly paid for Warehousing's 500 newly-issued shares, the controlled relationship between the two corporations, the dominant role played by Arthur A. Gallagher individually, the overshadowing induence of the Gallagher family, and the effective retention by Rental of the proceeds of the condemnation award, we are unable to find that its purported investment in the stock of Warehousing possessed economic subtsance. We therefore hold that the transaction in question did not constitute a bona fide stock purchase within the intendment of section 1033(a)(3)(A) of the Code and amounted to no more than a sham transaction. Knetsch v. United States, 364 U.S. 361;*339 Higgins v. Smith, 308 U.S. 473; Eli D. Goodstein, 30 T.C. 1178, affd. 267 F. 2d 127; Joseph H. Bridges, 39 T.C. 1064, affd. 325 F. 2d 180. We sustain the respondent's determination on this issue. Issue 2. Depreciation Deductions The total cost to A. A. Gallagher Warehousing Corp. of the property located at Delaware Avenue and Tasker Street, Philadelphia, Pennsylvania, on September 30, 1958, was: Contract price of land and build-ings$550,000.00Commissions and other expenses46,614.50Total cost$596,614.50The above cost was allocated by Warehousing to: Land$180,000.00Buildings416,614.50$596,614.50The assessed valuation by the City of Philadelphia was $513,000 for the land and $86,200 for the buildings. On its income tax returns for 1958 and 1959 Warehousing claimed depreciation deductions in the amounts of $10,415.36 and $41,661.45, respectively, based upon a 10-year useful life for its buildings. A report prepared by the engineering and valuation section of the office of the district director of internal revenue at Philadelphia stated as follows*340 with respect to petitioner's property: ENGINEERING AND VALUATION SECTION AUDIT DIVISION OFFICE OF DISTRICT DIRECTOR OF INTERNAL REVENUE, PHILADELPHIA, PA., ENGINEER'S REPORT, March 22, 1961 * * *RECOMMENDATION: (a) It is recommended that the $550,000 purchase price be allocated $367,000 to land and $183,000 to buildings. (b) That a useful life of 10 years be established for the buildings. DISCUSSION: The property formerly used as a sugar refinery has 552 ft. frontage on the Delaware River to the East, 101 ft. on Delaware Avenue to the West and 1047 ft. along the South side of Tasker Street to the North. Records in the assessor's office give an area of 512,945 sq. ft. with an additional area of 1322 sq. ft. vacated by City Ordinance Bill #2690 dated January 30, 1959. Assessed valuation is $513,000 for land and $86,200 for buildings. Water transportation is available through Piers 67 and 68 as shown on the property plot plan attached to the sales agreement. The piers are not being used at present. A portion of Pier 67 has collapsed. Pier 68 appears to be in useable condition but dredging would probably be required to insure proper depth for cargo ships. Rail spurs, *341 owned by Pennsylvania Railroad, extend into the property. The property has ample roads, access and parking area for trailer trucks. Adequate utility services extend into the plant including a power substation owned by the Philadelphia Electric Company located to the rear of Building No. 9. Buildings No. 6, 7, 12, 13, 14, 16 and 22 have been demolished and removed from the site. The roof on a portion of Building 8 has collapsed. Building 9 which is six story and adjoining Buildings 10 and 11, which are five story, are steel frame brick construction, in very dilapidated condition. While some portion of the lower floors is used for storage, the buildings are unsafe and should be demolished. No value is placed on these buildings. Buildings 2, 3, 4 and 5 are single story warehouse buildings with steel frame and roof girders. Walls are brick. The roof is asphalt on wood sheathing. Concrete floors are in good condition. Common front wall of buildings is the brick partition wall that was left after Buildings 6 and 13 were demolished. This wall has a ragged appearance due to the demolition work. Buildings have 35 feet of clearance to bottom of roof trusses. Condition is fair with the exception*342 of the leaky roof which will require extensive repairs. The floor space in this group of buildings is approximately 95000 square feet. Building 17 is a single-story brick building with steel frame and roof trusses and a built-up asphalt roof on concrete clab. Clearance from floor to trusses approximately 18 ft. Building is heated by steam unit heaters supplied by a boiler located in the building. Building is used as an automotive warehouse and paint shop. It has 17,475 sq. ft. of floor space and is in good condition. Building No. 13 is used for office space. It is brick construction with approximately 2500 sq. ft. of floor space. Condition is good. A 10,000 sq. ft. single story, garage-type building has been constructed alongside the office building No. 13. It is not shown on the polt plan, but occupies some of the space of Building No. 16, which was removed. The building has a concrete floor with wood framing, a corrugated metal roof and composition board siding. Mr. Yost, the Gallagher Company representative at the site, did not know the date of construction, but was of the opinion that it existed prior to the purchase by his company in 1958. This building is in good condition. *343 The taxpayer uses most of the warehouse space for the storage of new automobiles which are brought to the warehouses by auto transport trailers. Building No. 2 is leased to the Penn Paper and Stock Company for the storage of paper products. The remaining useful life of serviceable buildings (not including Buildings No. 8, 9, 10 and 11) is estimated at 10 years. VALUATION OF BUILDINGS: Fair market value of warehouses in fair condition with 10 years useful life is estimated to be $1 per sq. ft. This covers Buildings 2, 3, 4 and 5. The remaining buildings considered to be in good condition are valued at $2 per sq. ft. This includes Buildings 13, 17 and the 10,000 sq. ft. warehouse located adjacent to Building 13. Property improvements outside the buildings which include piers, paved parking areas, water, sewer and electric lines are valued at $100,000. 95,000 sq. ft. @ $1$ 95,00030,000 sq. ft. @ $260,000Piers, paving and utilities100,000Total$255,000VALUATION OF LAND: The assessed valuation of $513,000 or $1 per sq. ft. is considered to be a reasonable fair market value for this land. In substantiation of this figure a 7-Acre tract of waterfront*344 land located at Delaware Avenue and Bigler Street adjoining Publicker Industries was sold in November 1951 for $250,000. On a square foot basis this amounts to 81" per sq. ft. Considering the appreciation in land values $1 per square foot would be reasonable in 1958. $255,000 + $513,000 = $768,000 Allocation on basis of $550,000 purchase price: Conversion factor$550,000 / $768,000 =.716Land =$513,000 X.716 =$367,000Building =$255,000 X.716 =$183,000In his statutory notice of deficiency for 1958 and 1959 the respondent determined as follows: It is determined that the deductions for depreciation on buildings claimed on your returns for the taxable years ended December 31, 1958 and December 31, 1959 are excessive in the amounts of $7,717.68 and $30,820.74 [$30,870.74] respectively, computed as shown herewith: 19581959Depreciation claimed$10,415.36$41,661.45Depreciation allowable$215,814.15 at 5% =$10,790.71Allowable for 3 mo.period2,697.68Allowable for fullyear10,790.71Adjustment$ 7,717.68$30,870.74The amount of depreciation properly deductible by Warehousing for 1958 and 1959 depends*345 upon (1) the cost of the buildings acquired by Warehousing in 1958 which may be used as a basis for computing depreciation, and (2) the useful life of the buildings. 4(a) Depreciable Basis With respect to the determination of the proper depreciable basis of the buildings located at Delaware Avenue and Tasker Street acquired by Warehousing on September 30, 1958, it is necessary to ascertain what proportion of the total purchase price of $596,614.50 paid for the land and buildings is attributable to the buildings. The allocations of total purchase price as made by Warehousing, the respondent, and the City of Philadelphia, both in dollar amounts and percentages, may be summarized as follows: Respondent'sCity of Phila-A. A. GailagherStatutorydelphia,Warehousing% ofNotice of% ofassessed% ofCorp.totalDeficiencytotalvaluestotalLand$180,000.0032.7$380,000.0066.7$513,000.0085.6Buildings416,614.5067.3215,814.5033.386,200.0014.4Total$596,614.50100.0$596,614.50100.0$599,200.00100.0*346 The respondent's allocation of $215,814.50 to buildings was based in part upon the engineer's report prepared by the Commissioner's engineering and valuation section. The report recommended an allocation of $367,000 to land. To this amount the respondent added $13,800 representing the cost of demolition of certain buildings, resulting in an allocation to land of $380,800. The balance of $215,814.50 5 accordingly was allocated to buildings. Inasmuch as petitioners have introduced no evidence which discloses error in the respondent's determination, we leave the parties where we find them and the allocation to buildings determined in the notice of deficiency is sustained. (b) Useful Life With respect to the estimated useful life of the buildings acquired by Warehousing in 1958, the respondent contends that 20 years is the proper economic life to be utilized. The engineer's report prepared by the Commissioner's engineering and valuation*347 section is the principal evidence of record. The report recommended a 10-year useful life for the buildings in question, an estimate which coincides with the economic life used by petitioner in computing depreciation for 1958 and 1959. It is true, as the respondent contends, that he is not bound as a matter of law by the conclusions of his valuation engineers. James Couzens, 11 B.T.A. 1040; John D. Biggers, 39 B.T.A. 480; see Automobile Club of Michigan v. Commissioner, 353 U.S. 180, affirming 230 F. 2d 585, affirming 20 T.C. 1033. The engineer's report, to which the parties have stipulated, sets forth a detailed description of the property and contains an appraisal of the fair market value of the land and buildings as of 1958. No question has been raised concerning the qualifications of the engineers who signed the report, the methods employed in appraising the property, or the factual accuracy of the data recited therein. Consequently, the recommendations contained in the report are entitled to considerable weight as the opinions of qualified appraisers. On the basis thereof we find that the proper estimated*348 useful life to be used by petitioner for the purpose of computing depreciation on its buildings is 10 years. Decision in Docket No. 4870-62 will be entered under Rule 50. Decision in Docket No. 4871-62 will be entered for the respondent. Footnotes1. The $1,003.71 loss disclosed on the partnership information return was computed as follows: ↩Cost of improvements$48,599.52Less depreciation allowed47,595.81Loss$ 1,003.712. The amount was later changed from $166,217.35 to $166,217.50 to correct a 15-cent error.↩3. SEC. 1033. INVOLUNTARY CONVERSIONS. (a) General Rule. - If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted - * * *(3) Conversion Into Money Where Disposition Occurred After 1950. - Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of Gain. - If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * *↩4. The parties have raised no issue herein with respect to a possible remaining salvage value of the involved property at the close of its useful life.↩5. Although the notice of deficiency allocated $215,814.15 to buildings, paragraph 84 of the stipulation of facts discloses $215,814.50 as allocated by the respondent to buildings. The discrepancy of 35 cents is not explained by the parties.↩