**UNITED STATES of America, Plaintiff,**

v.

**Alejandro OREJEL-TEJEDA, Defendant.**

**Crim. No. 12743.**

United States District Court
N. D. California, N. D.

April 28, 1961.

Laurence E. Dayton, U. S. Atty., San Francisco, Cal., Robert E. Woodward, Asst. U. S. Atty., Sacramento, Cal., for plaintiff.

Jack T. Sherwyn, Los Angeles, Cal., for defendant.

**OLIVER J. CARTER, District Judge.**

Defendant was indicted in eight counts for the alleged illegal transportation of aliens in violation of 8 U.S.C.A. § 1324 (a) (2),[1] hereinafter referred to as Section 1324. The case was tried to the Court without a jury, and, after the evidence was closed, the defendant moved for a judgment of acquittal on the ground that the evidence did not show a violation of the statute. The evidence, while in stark contrast in some aspects, is virtually uncontradicted as to the basic elements of the alleged crime.

In the eight counts of the indictment defendant is charged with the illegal transportation of alien Mexican farm laborers from the vicinity of El Centro and Calexico in Imperial County, California, to the vicinity of Turlock in Stanislaus County, California. The Court takes judicial knowledge that El Centro and Calexico are cities in the Imperial Valley of California near the Mexican border, and that Turlock is in the San Joaquin Valley of California more than five hundred miles north of the Mexican border. The undisputed evidence establishes that the defendant transported alien Mexican farm laborers in two trips, four on each trip. The first trip was on June 26, 1960, from El Centro to Turlock, and the second trip was on July 10, 1960, from Calexico to Turlock. At the time of transportation the persons transported were alien, non-immigrant, Mexican farm laborers who had been lawfully admitted into the United States as agricultural workers for employment in Imperial, Riverside and San Diego Counties in California. All of the entries by the aliens were within three years of the transportation. The evidence is not clear as to whether all the transportees were restricted to employment in this particular area of California, but for the purposes of this memorandum it will be assumed that all the named persons were so limited by the entry permit form I-100C. There is also some conflict in the evidence as to whether the permits of some of the transportees had expired, and in this respect the Court finds that all of the entry permits were valid and unexpired at the

---

1. "(a) Any person * * * who— * *. (2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law; * * * any alien * * not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: * * *"

time of transportation. There is also some intimation that, as to the group transported from Calexico, defendant had met them before the transportation in Mexicali on the Mexican side of the border, and had made the arrangements for transportation in Mexico. The evidence does not support this intimation, and the Court finds that the arrangements for transportation and the transportation itself occurred in the United States after the persons transported had lawfully entered the United States under valid entry permits. There is also conflicting evidence on whether defendant knew at the time of transportation that the transported laborers were limited to the indicated southern California area by their entry permits. In this respect the Court finds that the defendant did have such knowledge. It is clear from the evidence that the defendant had the purpose of transporting Mexican farm laborers to the Turlock area to supply labor to farmers in that area, and that he was doing so for a profit to himself. The evidence is clear that he charged a great deal more for the trip to each person transported than the cost of transportation.

■ In transporting the aliens from an area in California where the aliens were lawfully admitted for agricultural work to an area in California where the aliens were not lawfully permitted to work under their entry permits has defendant violated the provisions of Section 1324, supra, which makes unlawful the transportation within the United States of "any alien * * * not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens * * *" by any person "knowing that he [the alien] is in the United States in violation of law." I conclude that he has not.

At the time of transportation all of the transported aliens had been "duly admitted to the United States by an immigration officer," and were "lawfully entitled to enter or reside within the United States" under the appropriate statutes, regulations and treaties. See Title V of the Agricultural Act of 1949, 7 U.S.C.A. §§ 1461–1468; 8 C.F.R. 214.2(k).[2] Such aliens had a non-immigrant status (8 U.S.C.A. § 1101(a) (15) (H) (ii) [3] and as such were subject to deportation for violations of the conditions of such status. (8 U.S.C.A. § 1251(a) (9)).[4] It was only when the aliens were transported to the Turlock area, which was outside of their permitted area of labor, that they were subject to deportation, and, to that extent, illegally in the United States. It could be argued logically that at that time they were not "lawfully en-

2. "An alien, native and citizen of Mexico, bona fide resident of that country for the preceding year, shall, upon fingerprinting on Form AR–4, be issued a Form I–100C and admitted for agricultural employment at a port of entry (reception center) provided the immigration officer is satisfied that the alien will, and the alien agrees to, abide by the following conditions: that he will engage only in employment specified in Title V of the Agricultural Act of 1949, as amended, the Migrant Labor Agreement of 1951, as amended, and the contract of employment approved by the Secretary of Labor; that he will depart upon the expiration of the period for which he was admitted; * * *"

3. 8 U.S.C.A. § 1101 provides: "(a) As used in this chapter * * * (15) the term 'immigrant' means every alien except an alien who is within one of the following classes of nonimmigrant aliens * * * (H) an alien having a residence in a foreign country which he has no intention of abandoning * * * (ii) who is coming temporarily to the United States to perform other temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country."

4. 8 U.S.C.A. § 1251 provides: "(a) Any alien in the United States * * * shall, upon the order of the Attorney General, be deported who * * * (9) was admitted as a nonimmigrant and failed to maintain the nonimmigrant status in which he was admitted * * * or to comply wtih the conditions of any such status."

titled to reside within the United States" and that defendant, in changing their lawful status by the transportation, came within the proscription of Section 1324. Such an interpretation would be at variance with some cardinal principles of statutory interpretation.

■■ The first basic principle to be observed is that Section 1324 is a penal statute, and, therefore, is to be strictly construed. United States v. Fruit Growers' Express Co., 279 U.S. 363, 49 S.Ct. 374, 73 L.Ed. 739; McBoyle v. United States, 283 U.S. 25, 51 S.Ct. 340, 75 L.Ed. 816, 3 Sutherland on Statutory Construction, p. 49, § 5604. But, of course, this is only one factor bearing upon the construction of this statute, and second, and equally important, is the construction of the statute in accordance with the intent of Congress in enacting the statute. United States v. Corbett, 215 U.S. 233, 30 S.Ct. 81, 54 L.Ed. 173; Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226.

In discussing the role of courts in statutory interpretation, the Court of Appeals for the Ninth Circuit in Carter v. Liquid Carbonic Pac. Corp., 1938, 97 F.2d 1, 3, stated:

"But in the construction of a statute the duty of the Courts is to ascertain the legislative intent 'not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will.' Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 93, 55 S.Ct. 50, 54, 79 L.Ed. 211."

In Herrera v. United States, 9 Cir., 1954, 208 F.2d 215, 216, the Court of Appeals for the Ninth Circuit, in discussing Section 1324, said:

"Public Law 283 is entitled 'An Act To assist in preventing aliens from entering or remaining in the United States illegally.' House Report No. 1377, 82nd Cong., 2nd Sess., indicates that the purpose of the legislation was to 'overcome a deficiency in the present law making it an offense to harbor or conceal aliens who have entered this Country illegally, *and to strengthen the law generally in preventing aliens from entering or remaining in the United States illegally.'* [Emphasis supplied.] The legislation appears to have been an outgrowth of the decision in United States v. Evans, 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823, in which it was held that the existing statute contained no penalty provision for a person convicted of harboring or concealing an alien illegally in the United States."

Again on page 217 of 208 F.2d the Court in referring to the meaning of paragraph (2) said:

" * * * paragraph (2) to the transportation of aliens within the United States by one who knows they are unlawfully here and who knows or has reason to believe that the alien's last entry occurred within three years prior to the transportation; * * * "

In Herrera as in all the other reported cases dealing with Section 1324 the violation had reference to the transportation of aliens who had entered the United States illegally, and who were transported while remaining illegally in the United States after illegal entry. In each case the prosecution was aimed at the transportation of so-called "wet backs." See Martinez-Quiroz v. United States, 9 Cir., 1954, 210 F.2d 763; Bernal-Zazueta v. United States, 9 Cir., 1955, 225 F.2d 60; Bernal-Zazueta v. United States, 9 Cir., 1955, 225 F.2d 64; Wilcoxon v. United States, 10 Cir., 1956, 231 F.2d 384; Vega-Murrillo v. United States, 9 Cir., 1957, 247 F.2d 735, (the same plaintiff had a similar proceeding reported in 264 F.2d 240); United States v. De Cadena, D.C.N.Cal.1952, 105 F.Supp. 202 (overruled in Herrera v. United States, supra); and United States v. Narvaez-Granillo, D.C.S.Cal.1954, 119 F.Supp. 556.

Research discloses no reported case which discusses the interpretation of "not lawfully entitled to * * * reside in the United States" as used in Section 1324 when there has been no illegal entry prior to residence by the alien. The history of the legislation as disclosed by House Report No. 1377, 82nd Cong. 2nd Sess. states the purpose for enacting Section 1324 in the following language:

"This bill is designed to effectuate two of the three recommendations made by the President in his message to Congress on July 13, 1951, in connection with his approval of S. 984, * * *

"Paragraph (2) of the same subdivision, *punishing the transporters of illegally entering aliens* would require that the transported alien was in the United States in violation of law and would also require proof or reasonable grounds for belief that the transported alien had entered the United States within the preceding 3 years." (Emphasis added.)

The report also states that the purpose of the legislation was "to strengthen the law generally in preventing aliens from entering or remaining in the United States illegally. In this context it would seem that "remaining" refers to remaining in the country after illegal entry. A careful reading of the whole legislative history, while not conclusive, would seem to support this conclusion.

This Court concludes that the history of this enactment establishes that Congress intended the phrase "not entitled to * * * reside" to refer to the time the alien transported entered the United States. The congressional history is not crystal clear, but it is certainly persuasive; however, coupled with the usual rule that criminal statutes are to be strictly construed in favor of defendant, it supports the conclusion that Section 1324(a) (2) of Title 8 U.S.C.A. does not proscribe the conduct of defendant herein.

Since the evidence does not show a violation of the statute defendant's motion for judgment of acquittal must be granted. Rule 29 Federal Rules of Criminal Procedure, 18 U.S.C.A.

It is ordered and adjudged that defendant is not guilty as charged in the indictment, and each count thereof, and defendant is discharged and bail exonerated.