**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Newton P. VAN DRUNEN, Defendant-
Appellant.**

**No. 73-2081.**

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1974.

Decided July 24, 1974.

As Amended on Denial of Rehearing
Aug. 21, 1974.

Certiorari Denied Dec. 23, 1974.
See 95 S.Ct. 684.

William J. Stevens, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Ann C. Tighe, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, CUMMINGS and SPRECHER, Circuit Judges.

CUMMINGS, Circuit Judge.

In June 1973, a two-count indictment was filed against defendant. In the first count, he was charged with transporting an alien from Brownsville, Texas, to Chicago Heights, Illinois, on October 15, 1971, knowing that the alien was illegally in the United States. The second count was identical except that it involved another alien and the transportation took place on November 7, 1971. Both counts charged violations of 8 U.S.C. § 1324(a) (2).[1]

The alien mentioned in Count I, Sara Resendez-Oliva, became defendant's wife a month after his indictment. She and

---

1. 8 U.S.C.A. § 1324(a) provides in pertinent part:

"Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

\*    \*    \*    \*    \*

"(2) knowing that he [alien] is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;"

\*    \*    \*    \*    \*

"any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs \*    \*    \*."

two of her three children entered the United States at Brownsville, Texas, on the authority of a local border-crossing card in October 1971. Defendant awaited her arrival there. They then traveled to Laredo, Texas, in his car and after spending two hours there, drove to Chicago Heights, Illinois, taking two or three days for the trip. Her other child had preceded her there. She and her three children lived with friends of defendant in Chicago Heights. She did not return to Mexico as planned because her fourth pregnancy made her ill.

The Count II alien, Josefina Acosta-Coronado Perez, was transported by defendant across the Rio Grande at midnight in a rowboat and then to Chicago Heights in his car. A month thereafter, she was reunited with her estranged husband in Chicago.

A jury found defendant guilty on both counts. He received concurrent three-year sentences, plus two years' probation and a $4,000 fine. We affirm.

*Instructions on Testimony by a Defendant*

Defendant first argues that the court's instruction that he had an absolute right to testify abridged the Fifth Amendment privilege against self-incrimination. Thanks to a slip in reading LaBuy Instruction 6.09 (33 F.R.D. 523, 581), the instruction in question provided as follows according to the official transcript:

"A defendant has the absolute right to testify, and the jury must not draw a presumption of guilt or any inference against the defendant because he did not testify.

"A defendant who wishes to testify is a competent witness and his testimony should not be disbelieved merely because he is the defendant. However, in weighing his testimony the jury should consider the fact that the defendant has a vital interest in the outcome of this trial."

The word "not" was inadvertently omitted by the judge after "absolute right" in the first line of this Government-tendered instruction.

■ At the trial, the following objection was given only with respect to this second paragraph of this instruction:

"The defendant objects to the giving of the government instruction marked as LaBuy 6.09, in that the second paragraph of that instruction calls special attention to the fact that the defendant did not take the stand to testify on his behalf, and we object to the granting of that second paragraph on the ground that it calls attention to the defendant's failure to testify."

When defendant moved for a mistrial after the court's charge, his counsel stated:

Your Honor, one instruction where the court stated the defendant has an absolute right to testify, is the way it was given, and then went on to give the second paragraph of the LaBuy instruction which called attention to the fact that the defendant did not take the stand and testify, and I think that is a violation of his Fifth Amendment rights and I move for a mistrial."

The policy reasons for requiring trial errors to be brought to the attention of the trial judge are never stronger than when the error is a completely unintentional slip of the tongue. This request for a mistrial was stated at sidebar and, like ourselves, the trial judge might easily have understood the "that" which allegedly violated Fifth Amendment rights to be only the second paragraph of the LaBuy instruction. Further, after the mistrial was denied, defendant did not request the court to insert the omitted "not." Since we cannot conclude that the omission was an incurable ground for a mistrial, the present objection comes too late. Federal Rule of Criminal Procedure 30.

■ The second paragraph of this instruction is fully supported by precedent when it is relevant. Reagan v. United States, 157 U.S. 301, 305, 15 S.Ct. 610, 39 L.Ed. 709; Stapleton v. United States, 260 F.2d 415, 420, 17 Alaska 713 (9th Cir. 1958); Black v. United States, 309 F.2d 331, 345 (8th Cir. 1962). Of course, when the defendant does not take

the stand it is completely irrelevant. Just as litigants have an obligation to state their objections, so the district judge has an obligation to listen to objections. We are confident this instruction would have been eliminated if the trial judge had listened to the objections instead of having them read to the court reporter in his absence. However, we do not find the error reversible, at least where, as here, the error was immediately preceded by the court's inclusion of the phrase that "the jury must not draw a presumption of guilt or any inference against the defendant because he did not testify." Since the jury will inevitably notice whether the defendant took the stand, any meaningful inquiry into whether this error is harmless must focus on whether the jury was encouraged to draw an improper inference, and not simply whether the jury was reminded of a fact which it already well knew.

*Testimony of Wife Against Defendant*

■ Defendant next urges that the trial judge should have excluded the testimony of defendant's wife because of the privilege against the testimony of a spouse. Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125. In United States v. Kahn, 471 F.2d 191, 194, (7th Cir. 1972), reversed on other grounds, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225, we held that the somewhat related privilege for confidential marital communications did not apply where the conversations were about an unlawful enterprise in which both spouses participated. Here too, both spouses participated in the Count I violation. *Kahn* is not necessarily controlling, for the two marital privileges must "be sharply distinguished." McCormick on Evidence, (2d ed. 1972), § 78; see generally *id.*, §§ 66, 78–86. But we think that considerations similar to those in *Kahn* support affirmance here.

The underlying reason for both privileges is to preserve the family. The privilege for confidential marital communications is thought to do this by encouraging the spouses to be frank and open

with each other and by protecting marital privacy (*Kahn* at 194) ; the privilege against spousal testimony serves the same goal by preventing either spouse from committing the "unforgivable act" of testifying against the other in a criminal case (*Hawkins* 358 at 78, 79 S.Ct. 136). In *Kahn* we concluded that the public interest in preserving the family was not great enough to justify protecting conversations in furtherance of crimes joined in by both spouses; similarly here, we think that goal does not justify assuring a criminal that he can enlist the aid of his spouse in a criminal enterprise without fear that by recruiting an accomplice or coconspirator he is creating another potential witness.

United States v. Doughty, 460 F.2d 1360, 1363 (7th Cir. 1972), supports this result. That case involved the admission in evidence against a husband of an estate tax return prepared by his wife. Although the opinion did not clearly separate the two marital privileges, it held that neither prevented the admission of this return. The court concluded that the admission of her written return, considered as testimony of the wife against the husband, would be less disruptive of the marriage than her live oral testimony. But the court also relied on the "participation of both husband and wife in the offense" to defeat the privilege.

Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125, reversing 249 F.2d 735 (10th Cir. 1957), is arguably a barrier to the result reached today. That case reaffirmed the privilege against spousal testimony in the federal courts without discussing possible exceptions and without indicating whether both spouses participated in the offense. The Court of Appeals' opinion reveals that defendant in that Mann Act prosecution transported a woman from Dogpatch, Oklahoma, to Mena, Arkansas, and thence to Tulsa, Oklahoma, where the woman worked as a prostitute with defendant's wife. It is fairly clear that both spouses were engaged in a conspiracy to violate state prostitution laws ; it is much less clear that the wife

had anything to do with the transportation across the state line, which was the federal offense. But if the case be treated as involving a joint criminal venture by the spouses, then the Supreme Court has held *sub silentio* that the privilege against spousal testimony applies in such a case.

We do not view *Hawkins* as controlling. *Sub silentio* holdings "obviously * * * are not of the same precedential value as would be an opinion of this Court treating the question on the merits." Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662. *Hawkins* must be accorded even less precedential value on the question whether there is a coconspirator exception to the privilege against spousal testimony, because the facts are so uncertain that it is not clear there was even a *sub silentio* holding. The Supreme Court has since announced an exception to *Hawkins* for cases where one spouse commits a crime against the other (Wyatt v. United States, 362 U.S. 525, 80 S.Ct. 901, 4 L. Ed.2d 931), and we decline to read the *Hawkins* opinion as foreclosing the possibility of other exceptions not discussed therein.

Today's holding, combined with *Wyatt*, limits the privilege to those cases where it makes most sense, namely, where a spouse who is neither a victim nor a participant observes evidence of the other spouses's crime. In that circumstance, the privilege encourages the preservation of a marriage which may conceivably be an important institution contributing to the rehabilitation of the defendant spouse.

█ █ In any event, we conclude that since defendant's wife's testimony concerned matters prior to the marriage, the privilege against the testimony of a spouse is inapplicable in accordance with Rule 505(c) of the proposed Federal Rules of Evidence, which was framed to eliminate the possibility of suppressing testimony by marrying a witness. Here, as the Government has noted, the marriage took place one month after defendant's indictment. As the Advisory Committee concluded, the prevention of collusive marriages justifies such an exception to the *Hawkins* rule.

### Refusal of Defense Instructions

█ Defendant next complains that two of his instructions were erroneously refused as to Count I. The first was his proposed instruction No. 10, which provided:

> "A Mexican National to whom a currently valid United States Immigration and Naturalization Service border crossing card has been issued may lawfully enter the United States and travel within the United States.

> "A Mexican National may not lawfully enter the United States as an Immigrant or permanent resident without an Immigrant Visa."

This instruction was properly refused because it misleadingly omitted the limitation on the right of a Mexican national bearing a border-crossing card (such as defendant's wife) to enter the United States lawfully and "travel within the United States." 8 CFR § 212.6(a) confines such a person to a 72-hour visit in the immediate border area, unless additional documentation has been procured.[2] This construction is consonant with the restriction contained on defendant's wife's Form I-86, which states:

> "This card when used as the sole entry document is valid only for visits to the

2. 8 CFR § 212.6(a) provides in part:
"If found otherwise admissible, the rightful holder of a Mexican nonresident alien border crossing card, Form I–186, may be admitted to the United States as a nonimmigrant visitor at a Mexican border port of entry without additional documentation for a period of 72 hours or less to visit in the immediate border area. The rightful holder of a Form I–186 seeking entry as a non-immigrant visitor at a Mexican border port of entry for a period of more than 72 hours * * * shall, if admitted, be issued Form SW–434, and if seeking entry as a nonimmigrant visitor at a Mexican border port of entry for a period of more than 15 days, or to proceed to an area in the United States other than Texas, New Mexico, Arizona, or California, shall, if admitted, be issued Form I–94."

U. S. within 25 miles of the Mexican border for periods of 72 hours or less if the bearer is found otherwise admissible by U. S. Immigration officer. To remain for a longer period or proceed to other areas in the U. S. the bearer must be in possession of a Form SW-434 or Form I-94 issued by an officer of the U. S. Immigration and Naturalization Service." [3]

Mrs. VanDrunen testified she was aware of and understood this information.

Defendant has not claimed that his wife sought entry for more than 72 hours or to travel beyond the immediate border area, and there is no evidence that she possessed Form SW-434 or Form I-94. On the contrary, she testified that when she came to the immigration guardhouse, "I was just asked where I was going and I told them I was going across and that was all." Consequently, she was only authorized to enter the immediate border area and remain for 72 hours, so that defendant's instruction No. 10 was improper.

■ Defendant also claims to have been entitled to his proposed instruction No. 11, which provided:

"If you find then that the defendant reasonably believed that Sara Resendez-Oliva was a temporary visitor in the United States on or about October 15, 1971, then you shall find the defendant not guilty on Count I. If on the other hand you find beyond a reasonable doubt that the defendant knew that on October 15, 1971, Sara Resendez-Oliva intended to reside in the United States permanently and if you find that the government has proved each element of the offense then you should find the defendant guilty on Count I."

We conclude that this theory of defense was sufficiently embodied in the other instructions given by the court, and that it was incorrectly stated in proposed instruction No. 11. To be a cor-

rect statement of the law, that instruction would have to substitute "72-hour border area visitor" for "temporary visitor" and "remains * * * more than 72 hours" for "reside * * * permanently." Being an inaccurate statement of the law, instruction No. 11 was properly refused. There was no need for the judge to quote the latter portion of 8 CFR § 212.6(a) (note 2, *supra*). The court did charge that she was entitled to entry for a period of 72 hours or less to visit in the immediate border area "without additional documentation"; since there was no evidence that she sought or obtained such additional documentation, it would have been irrelevant to explain to the jury forms that could have been issued and the travel privileges that might have been granted.

■ Finally in connection with these instructions, defendant relies on United States v. Orejel-Tejeda, 194 F.Supp. 140 (N.D.Cal.1961). There the aliens were transported from an area in California where they were lawfully admitted for agricultural work to an area in California where they were not lawfully permitted to work under their entry permits. Such transportation was held not to violate 8 U.S.C. § 1324(a)(2), because their original entry and residence were clearly lawful. The statute forbids the transportation of aliens only if they were "not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States * * *." Mrs. VanDrunen testified that she understood the time and place limitations on her presence in the United States, that she nonetheless entered with intent to go to Chicago, and that when asked by an immigration official at the border where she was going, she concealed her intent to go to Chicago. Had she answered truthfully, she would have been admitted, if at all, only after further processing. Because she sought to "enter the United States, by fraud, or by willfully misrepresenting a material

---

3. The card was admitted as an exhibit at Transcript 141; but the exhibits have not been transmitted to this Court. However, the quotation from the card at Government Brief 13 is not disputed by defendant.

fact", she was not entitled to enter. See 8 U.S.C. § 1182(a)(19). Even more clearly, she was not entitled to reside in the United States. Consequently, the rationale of *Orejel-Tejeda* is inapplicable.

### Propriety of Voir Dire

Initially, defendant asserts that the district judge should have asked four of his proposed questions about possible juror prejudice with respect to Spanish-speaking people and immigrants. In refusing to ask those questions, the court explained that in the voir dire it had conducted under Rule 24(a) of the Federal Rules of Criminal Procedure, "Now, most of the questions which you had, I dealt with, Mr. Stevens." Our study of the voir dire shows that the court's statement was correct because the judge had asked the veniremen at least five questions about this general subject and had adequately explored possible jury bias and prejudice with respect to Spanish-speaking people.

■ The court did refuse to put two of defendant's questions with respect to juror fairness in the event evidence was introduced as to his morals, especially as to his "sexually adventurous" life and "affairs with many women." However, during the voir dire, the trial judge was not advised that defendant's private life would be brought out at trial and, apart from submitting a list of 15 questions for the voir dire, defense counsel did not explain why he felt that these two questions must be put. We cannot say that the few references to defendant's having lived with three of the witnesses substantially prejudiced his rights in the absence of putting the two questions to the veniremen. In the circumstances of this case, the district judge did not abuse his discretion in refusing to ask questions 11 and 12 on defendant's tendered list of voir dire questions. Compare *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46, and *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054, both involving jurors' racial prejudice against Negro defendants.

### Electronic Surveillance

■ Finally, defendant's brief submitted that his evidence at a pretrial hearing presented a *prima facie* case of the existence of governmental electronic surveillance of his telephone. The district judge's finding that there was nothing credible in the record that would prove surveillance of defendant's phone is not clearly erroneous. Furthermore, the prosecutor's sworn denial of the existence of such surveillance was sufficient under *Korman v. United States*, 486 F.2d 926 (7th Cir. 1973). Consequently, to remand the case "with directions to disclose the wiretap or dismiss the indictment," as prayed by defendant, would be unwarranted.

### Resentencing Hearing

■ ■ Rule 32(a)(1) of the Rules of Criminal Procedure requires the sentencing judge to ask the defendant personally "if he wishes to make statements in his own behalf and to present any information in mitigation of punishment." This was not done. The Government has conceded that the procedure at sentencing was defective for lack of allocution, thus requiring a remand. Of course, the district court need not impose the same sentence as before.

For the foregoing reasons, the judgment of conviction is affirmed, but the case is remanded to the district court for resentencing.