**UNITED STATES of America, Appellee,**

v.

**Richard D. BUNKER, Appellant.**

**No. 75–3401.**

United States Court of Appeals,
Ninth Circuit.

March 22, 1976.

Michael Lacey (argued) and James M. Elliot (argued), Law Office of Michael J. Monroe, Tucson, Ariz., for appellant.

William D. Vogel, Asst. U. S. Atty. (argued), Tucson, Ariz., for appellee.

## OPINION

Before ELY and HUFSTEDLER, Circuit Judges, and SMITH,* District Judge.

HUFSTEDLER, Circuit Judge.

A jury convicted Bunker upon six counts of knowingly bringing into the United States aliens who were not lawfully entitled to reside here. (8 U.S.C. § 1324(a)(1).)[1] Bunker argues that: (1) the indictment charging him was facially defective because it did not allege his knowledge of the aliens'

illegal status; (2) the evidence against him was insufficient to prove his knowledge; and (3) the district court's construction of the statute under which he was charged is incorrect. We reject all of his contentions.

█ Bunker was the president of a business in Salt Lake City employing 40 to 50 people, and the owner of a ranch near Gandy, Utah. He had previously employed Mexican citizens on his ranch. Bunker agreed to take a painter, Fidel Alvarez-Baeza ("Alvarez"), Alvarez's wife, three children and step-daughter from their home in Imuris, Sonora, to live at his ranch or his home in Salt Lake City. The Alvarez family were all Mexican citizens who had only border crossing identification cards (Form I-186, see 8 C.F.R. § 212.1(c)), which allowed them to stay in the United States for 72 hours and limited them to an area within 25 miles of the United States-Mexican border. About November 18, 1974, Bunker drove them from their home to the border at Nogales, and, after they had gone through immigration, to his ranch. He then drove Mrs. Alvarez to his Salt Lake City home. Alvarez and the children stayed at the ranch for about 2½ months and then joined Mrs. Alvarez in Salt Lake City. About a month later, following a dispute between the Alvarezes and Mrs. Bunker, Bunker's

---

* Honorable Russell E. Smith, Chief United States District Judge, District of Montana, sitting by designation.

1. § 1324. Bringing in and harboring certain aliens; persons liable; authority to arrest

(a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

(4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of—

any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom· any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

son drove the family back to Mexico. The total stay was about 3½ months.

The indictment charged that Bunker:

"knowingly and intentionally did bring into the United States of America, by means of transportation and otherwise, an alien . . . who was then and there not entitled to reside in the United States . . . ."

This count was repeated for each of the family members. Knowledge of the aliens' illegal status (their lack of entitlement to reside) is an essential element of the crime proscribed by § 1324(a)(1). (*Bland v. United States* (5th Cir. 1962) 299 F.2d 105.) Bunker asserts that the indictment failed to charge him with such knowledge. He reads "knowingly and intentionally" to modify only "did bring into the United States . . . an alien." We think that the language of the indictment can also logically be read so that "knowingly and intentionally" modifies "who was then and there not entitled to reside in the United States." Although it would have been better draftsmanship to reiterate the knowledge element, the language used conveys the proper message. We therefore reject Bunker's linguistic argument as did the Fifth Circuit in a recent case. (*Boerner v. United States* (5th Cir. 1975) 508 F.2d 1064, 1066; *cf.* *Hopkins v. United States* (9th Cir. 1969) 405 F.2d 770, 771.)

Bunker's state of mind was one of the key issues at the trial. Both Mr. and Mrs. Alvarez testified that Bunker knew that the family had only border crossing cards and that he was well aware of the limitations on them. They stated that Bunker drove them through the immigration checkpoint at Nogales and coached them to keep quiet if the immigration officers asked any questions. They said that Bunker drove a route from Nogales, Arizona, to the ranch designed to avoid detection at immigration checkpoints. Alvarez further stated that Bunker had previously taken Mexican citizens, some or all of whom did not have work permits, to work at his ranch.

Throughout the trial, Bunker maintained that he was completely ignorant of the restrictions and that the Alvarezes had not informed him of them. He claimed that he had not crossed the border with them; they had crossed on foot and met him later. He said that he did not hear them questioned at the border. He also testified that when he had previously employed Mexican laborers, he had either been told that they had proper papers, or had assumed that they were legally residing in this country.

Bunker attempts to undermine the adverse testimony by pointing to alleged inconsistencies in Alvarez's story. Of the asserted inconsistencies, only one goes to Bunker's knowledge, *i. e.*, the claim that Alvarez never testified that he told Bunker of the restrictions. The discrepancy dissolves on close scrutiny: Alvarez testified on both direct and cross-examination that he had told Bunker of the restrictions and had discussed them with him. The other inconsistencies go to credibility and were fully exposed to the jury by Bunker's counsel on cross-examination. Credibility is exclusively within the jury's province. (*United States v. Sidman* (9th Cir. 1972) 470 F.2d 1158; *United States v. Williams* (9th Cir. 1970) 435 F.2d 642; *Moody v. United States* (9th Cir. 1967) 376 F.2d 525. *See* 9 Wigmore on Evidence § 2549 (3d ed. 1940).) The jury has broad latitude in weighing evidence (*Hiram v. United States* (9th Cir. 1965) 354 F.2d 4), and the existence of inconsistencies does not require it to reject the testimony. (*Coates v. United States* (1969) 134 U.S.App.D.C. 97, 413 F.2d 371; *see also United States v. Crandell* (1st Cir. 1972) 453 F.2d 1216; *United States v. Fuentes* (5th Cir. 1970) 432 F.2d 405.) Because there was substantial evidence that Bunker had the requisite knowledge and on review we must construe that evidence most strongly for the appellee. (*Glasser v. United States* (1942) 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704; *United States v. Anderson* (1974) 165 U.S.App.D.C. 390, 509 F.2d 312), Bunker's effort to counter Alvarez's story fails.[2]

---

**2.** Bunker states that since Mrs. Alvarez spoke very little English and he spoke no Spanish, her

reports of the conversations between Bunker and her husband were hearsay. However, it

Since we see no reason to reject the jury's verdict that Bunker knew of the entry restrictions, it follows that this case presents no issue whatever of "imputed intent." The knowledge would be imputed only if Bunker was unaware of the restrictions. But the trial judge clearly instructed the jury that Bunker's own knowledge was an element of the crime. The jury convicted him on that basis. While it may be that Bunker acquired his information from Alvarez, the knowledge was no less his own.

Bunker argues that section 1324(a)(1) and its predecessor (Act of February 5, 1917, Ch. 29, § 8; 39 Stat. 880) historically were used to punish the smuggling and surreptitious entry of aliens, and thus can only be used for that purpose. (2 C. Gordon & H. Rosenfield, Immigration Law and Procedure, § 6.23b (1966). Section 1324(c)(1) is "substantially the same," for Bunker's purposes, as the prior section [H.R.Rep.No.1377, 82d Cong., 2d Sess. (1952), reprinted at 1952 U.S.Code Cong. & Admin.News 1358, 1359].) We agree that an illegal entry has been at the core of essentially all prosecutions under this section. (*See, e. g., United States v. Washington* (5th Cir. 1973) 471 F.2d 402; *United States v. Orejel-Tejeda* (N.D.Cal. 1961) 194 F.Supp. 140, 142.) But Bunker's result does not necessarily follow.

In 1952, Congress recodified the immigration and naturalization laws to give them their current structure. (Immigration and Nationality Act of 1952, Ch. 477, 66 Stat. 166; see H.R.Rep.No.1365, 82d Cong., 2d Sess. (1952), reprinted at 1952 U.S.Code Cong. & Admin.News 1653.)[3] The recodification included both sections 1182 and 1324. Section 1182, found in the part of the act dealing with admissions qualifications, sets out a list of aliens, including nonimmigrants, who "shall be . . . excluded." It also details the type of documentation

needed for entry and grants the Attorney General alone, or in concert with the Secretary of State, the authority to waive some documentary requirements. Chapter 8 (§§ 1321–30) contains the general penalty provisions for violation of the Act.

■ The Alvarezes were nonimmigrants. Typical nonimmigrants entering for business or pleasure need a passport and either a nonimmigrant visa or a border crossing identification card to enter. (8 U.S.C. § 1182(a)(26).) But regulations jointly proclaimed by the Attorney General and the Secretary of State can waive either or both of these requirements for Mexican citizens. (8 U.S.C. § 1182(d)(4)(B).) Pursuant to this authority, the regulations which were in effect when the Alvarez family entered allowed Mexican nationals to enter with only a border crossing card on Form I–186. (8 C.F.R. § 212.1(c) (1975).) As a prelude to getting the I–186 card, the applicant must have submitted an I–190 form and have been "interrogated concerning his eligibility for a nonresident border crossing card." (8 C.F.R. § 212.6(b) (1975).) The I–190 form carries an agreement that the applicant will abide by the limitations on the length and place of his stay. At the border, "[e]very nonimmigrant alien applicant for admission . . . shall establish that he is admissible to the United States . . . [and] agree that he will abide by all the terms and conditions of his admission . . . and that he will depart at the expiration of the period of his admission . . . ." (8 C.F.R. § 214.1(a) (1975).)

Section 1182(a)(19) says:

"Except as otherwise provided in this chapter, the following classes of aliens shall be . . . excluded from admission into the United States: . . . (19) Any alien who seeks to procure, or

---

appeared from the record that the meetings among the Alvarez family and Bunker involved some translation and some comprehension by Mrs. Alvarez of English words she knew. There was hearsay mixed with personal knowledge. No hearsay objection was interposed and the point is not preserved on appeal. (F.R.

Evid. § 103(a)(1); *Olender v. United States* (9th Cir. 1956) 237 F.2d 859.)

**3.** The act was amended in 1965 to remove the national origin quota system (Act of October 3, 1965, Pub.L. 89–236, 79 Stat. 911), a change not here relevant.

has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States by fraud, or by willfully misrepresenting a material fact."

The record is unclear as to where or how the Alvarez family procured their I–186 cards; we cannot say that they were issued their documentation through their fraud or willful misrepresentation. (*See* 1 C. Gordon & H. Rosenfield, *supra*, § 2.37, at 2–173.) However, it is plain that they intended to violate their agreement under 8 C.F.R. § 214.1(a) and thus fraudulently sought to enter and should have been excluded. They were therefore not lawfully entitled to enter or reside under section 1324(a)(1). The Seventh Circuit has reached this result with respect to the entry element. (*United States v. Van Drunan* (1974) 501 F.2d 1393.)

Sections 1182 and 1324 are both part of the same comprehensive statutory scheme. It would undercut congressional intent to read them as unrelated, as Bunker urges. Our understanding of the nexus between these sections draws further nourishment from section 1325. That section punishes the alien who obtains entry by willful misrepresentation or concealment of a material fact. Since such aliens are also excluded by section 1182, it would be anomalous to punish them and not hold culpable the person who brings them in, in the face of section 1324's clear singling out of those who bring in aliens not entitled to enter or reside.

Our construction of section 1324(a)(1) advances the purposes of the immigration laws. Section 1182 explicitly protects the United States labor market by prohibiting the entry of aliens "for the purpose of performing skilled or unskilled labor" unless the Secretary of Labor has certified that there is a shortage of United States citizens available to do the work. (8 U.S.C. § 1182(a)(14). *See also* S.Rep.No.748, 89th Cong., 1st Sess. (1965), reprinted at 1965 U.S.Code Cong. & Admin.News 3328, 3329, 3333–34; H.R.Rep.No.1377, *supra*, reprinted at 1952 U.S.Code Cong. & Admin.News

1653, 1705.) Bunker's use of the Alvarez family was directly contrary to this statutory goal. We also note, as the trial judge did in most emphatic terms, that importation of illegal aliens often leads to the abuse of the aliens themselves. Preventing the importation of aliens known to intend to remain and to work protects both the United States labor market and the exploitable aliens.

Our rationale is consistent with *Orejel-Tejeda, supra*. In that case, the defendant did not violate section 1324 because the aliens' entry was untainted by fraud. Fraud pervaded this entire transaction. Prohibitions of fraudulent entries fill the Immigration and Nationality Act. (*See, e. g.*, 8 U.S.C. §§ 1182(a)(19), 1321, 1325.) Although section 1324(a)(1) prosecutions are commonly based on smuggling of the usual sort, there has never been any indication that more subtle kinds of smuggling were not also within its reach.[4]

AFFIRMED.

---

**4.** Bunker's reliance on *Bouie v. Columbia* (1964) 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 is misplaced. No due process issue is involved in Bunker's case.