### In re GRAND JURY SUBPOENA OF [WITNESS].

### Misc. No. MJG–95–658.

United States District Court,
D. Maryland.

May 9, 1995.

---

David B. Irwin, Irwin, Kerr, Green, McDonald and Dexter, Baltimore, MD, for Witness.

Joyce McDonald, Asst. U.S. Atty., Baltimore, MD, for the Government.

GARBIS, District Judge.

The Court has before it the Motion to Quash Grand Jury Subpoena filed by a party hereinafter referred to as "Ms. Witness" and the materials submitted by the parties relating thereto. The Court has held a hearing, including the taking of evidence, and had the benefit of the arguments of counsel.

This case involves an ongoing grand jury investigation of certain matters including allegedly fraudulent activities of an individual who shall hereafter be referred to as "Mr. Target." The questions before the Court are:

1. Whether Ms. Witness' marriage to Mr. Target after the service of a Grand Jury subpoena on her is to be recognized when she asserts a testimonial privilege based upon her marital status?

2. If so, what is the extent of the privilege?

For reasons set forth herein, the Court concludes that Ms. Witness may claim such a privilege, but only with respect to matters (including communications) taking place after her marriage.

## I. PERTINENT FACTS

In May of 1991, Ms. Witness graduated from professional school and began working for an established practitioner in her field in a Northern State. The practitioner had as a client Mr. Target, a person whose business includes the maintenance of properties owned by others. Ms. Witness promptly began rendering professional services in connection with properties managed by Mr. Target. In the Fall of 1991, a personal relationship between Ms. Witness and Mr. Target began.

By the Spring of 1992, the relationship between Ms. Witness and Mr. Target was a serious romantic one, although Mr. Target was, at the time, married with children. During the Summer of 1992, Ms. Witness broke off the relationship in view of Mr. Target's married status and unwillingness to leave his wife. However, in the Fall of 1992, the relationship was reestablished.

In the Spring of 1993, Mr. Target divorced his wife. By the Fall of 1993, Ms. Witness was living together with Mr. Target, but there were no particular plans for a marriage. They cohabited until October of 1994 when Ms. Witness took a new professional position and moved to Florida. When Ms. Witness relocated to Florida, she moved into a condominium Mr. Target had purchased in 1993. Mr. Target continued to see Ms. Witness after the move, coming to Florida every two to three weeks.

Since 1992, Ms. Witness had wished to marry Mr. Target and frequently discussed this desire with him. Mr. Target did not decide that the time had arrived to get married, however, until the grand jury subpoena at issue was served upon Ms. Witness on January 10, 1995. At that point, motivated

by the perceived benefit of a claim of spousal privilege before the Grand Jury, Mr. Target agreed to marry Ms. Witness. Therefore, on February 3, 1995, prior to Ms. Witness' Grand Jury appearance and without prior notice to family and friends, Ms. Witness and Mr. Target were legally married in a civil ceremony in Florida.

Since the marriage, Ms. Witness and Mr. Target have lived in separate states. Mr. Target continues to travel to Florida to see Ms. Witness periodically and plans to relocate in Florida at some time in the future.

The Court concludes that Mr. Target was motivated to enter into the marriage with Ms. Witness on February 3, 1995 by a desire to obtain the protection of the adverse spousal testimony privilege. He would not have married her at that time absent this motivation and, perhaps, may never have agreed to marry her. Nevertheless, the fact remains that on February 3, 1995, Ms. Witness and Mr. Target were legally married.

## II. DISCUSSION

### A. "Sham" Marriage Claim

■ The Government argues that Ms. Witness should be precluded from asserting any spousal privilege because her marriage to Mr. Target was a "sham." A court may refuse to recognize a spousal privilege when a couple weds only for the purpose of using the marital relationship in a scheme to defraud. See, e.g., United States v. Apodaca, 522 F.2d 568 (10th Cir.1975); United States v. Saniti, 604 F.2d 603, 604 (9th Cir.1979).

■ As stated by the Supreme Court in Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953):

When the good faith of the marital relation is pertinent and it is made to appear ... that the relationship was entered into with no intention of the parties to live together as husband and wife but only for the purpose of using the marriage ceremony in a scheme to defraud, the ostensible spouses are competent to testify against each other.

344 U.S. at 614–15, 73 S.Ct. at 487–88.

In the case at Bar, the timing, and quite possibly the fact, of the marriage was motivated by the service of a Grand Jury subpoena. Nevertheless, the marriage was more than a mere legal formality.

In this case, the couple had lived together in a spousal equivalent relationship for a sufficient period of time before their marriage to enable the Court to conclude that the personal relationship was genuine. Moreover, in the modern world, it is not uncommon for couples to live as spousal equivalents and defer the formalization of their relationship until there appears some reason to become legally married. Thus, for example, some couples will decide to marry only when the woman becomes pregnant and they desire to ensure the legitimacy of their child. Moreover, in today's society, marriages can be entered into to obtain legal benefits. Hence, a couple may be motivated to marry in order to qualify for the benefit (to them) of filing joint income tax returns.[1]

This Court concludes that Ms. Witness and Mr. Target were genuinely married and that the obtaining of spousal privilege protection for Mr. Target was a substantial motivating factor but not the only reason for the marriage. Accordingly, the Court concludes that the marriage is not a "sham" and Ms. Witness is entitled to claim the spousal privilege. See In re Grand Jury Proceedings (84–5), Emo v. United States, 777 F.2d 508, 509 (9th Cir.1985) (holding that "mere suspicious timing of marriage does not support a finding of a sham marriage, especially when other evidence, such as living together or intentions of as husband and wife, indicates that the marriage was entered into in good faith."); In re Grand Jury Proceedings (86–2, 640 F.Supp. 988 (E.D.Mich.1986) (holding that privilege applied where there was no evidence that the couple entered into their marriage with no intention of living together as husband and wife).

---

1. Compare the case of Boyter v. Commissioner, 668 F.2d 1382 (4th Cir.1981), in which a couple divorced every December and remarried in January to take advantage of the lower (for them) income tax rates available if they filed as unmarried.

## B. Scope of the Privilege

■ In *Trammel v. United States*, 445 U.S. 40, 41, 44–45, 100 S.Ct. 906, 907, 909, 63 L.Ed.2d 186 (1980), the Supreme Court charted the evolution, or devolution, of the adverse spousal privilege. The Court began by characterizing the two "canons of medieval jurisprudence" upon which the privilege was based—(1) that an accused was not allowed to testify in his own behalf because of his interest in the proceeding, and (2) the concept that the husband and wife were one, and since the woman had no recognized existence, the husband was that one—as "two now long-abandoned doctrines." 445 U.S. at 44, 100 S.Ct. at 909. The Court then noted that the privilege against spousal testimony nonetheless had remained intact in many common-law jurisdictions, with its modern justification resting in its "perceived role in fostering the harmony and sanctity of the marriage relationship." 445 U.S. at 45, 100 S.Ct. at 909. Although the privilege remained intact, it had received harsh criticism, with one eminent legal scholar deeming it "the merest anachronism in legal theory and an indefensible obstruction to truth in practice," and others calling for its abolition. *Id.*, *quoting* Professor Wigmore in 8 Wigmore § 2228, at 221, and citing 63 American Bar Association Reports 594–95 (1938).[2]

In *Trammel*, the Supreme Court specifically addressed the issue of whether an accused spouse could invoke the adverse testimony privilege. Recognizing that Congress, in enacting Rule 501 of the Federal Rules of Evidence, had expressly endowed the federal courts with the power to "continue the evolutionary development of testimonial privileges in federal criminal trials 'governed by the principles of the common law as they may be interpreted ... in light of reason and experience,'" the Court proceeded to find that "reason and experience" no longer justified allowing the accused spouse to assert the privilege. *Id.*, 445 U.S. at 47, 100 S.Ct. at 910. Thus, the Court held that the privilege should be modified "so that the witness-spouse alone has a privilege to refuse to testify adversely," thereby "further[ing] the important public interest in marital harmony without unduly burdening legitimate law enforcement needs." *Id.*, 445 U.S. at 53, 100 S.Ct. at 914.

Three years after *Trammel* was decided, the Seventh Circuit further constricted the privilege. In *United States v. Clark*, 712 F.2d 299 (7th Cir.1983), the court drew upon its earlier ruling in *United States v. Van Drunen*, 501 F.2d 1393, 1397 (7th Cir.), *cert. denied*, 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974), in holding that the adverse spouse testimony privilege did not cover acts which occurred prior to marriage. *Clark*, 712 F.2d at 302. After conceding that the *Van Drunen* premarriage acts exception was created, in part, because of a concern with "collusive marriages," the court held that the exception was not limited exclusively to these occasions. The court reasoned:

> By imposing a general rule that the privilege does not cover premarriage acts, courts can avoid mini-trials on the issue of the sincerity of the parties in getting married. The limitation on the scope of the privilege of a spouse not to testify is consistent with the general policy of limiting the privilege because it interferes with fact-finding.

*Id.*

This Court agrees with the conclusion and rationale of the Seventh Circuit in *Clark*. Further, it predicts (as it must) that the United States of Appeals for the Fourth Circuit will agree with the Seventh Circuit. As the Supreme Court stated in *Trammel:*

> [t]estimonial exclusionary rules and privileges contravene the fundamental principle that "the public ... has a right to every man's evidence." As such, they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."

*Trammel*, 445 U.S. at 50, 100 S.Ct. at 912 (citations omitted). Particularly in light of

**2.** Indeed, several commentators proposed replacing the existing privilege with one which protected only private marital communications, modeled on the privilege between priest and penitent, attorney and client, and physician and patient. *Id.*, *citing* 8 Wigmore, § 2332 *et seq.*

the facts in the instant case, the spousal privilege should not be available to block testimony as to events and communications occurring prior to marriage.

### III. *CONCLUSION*

Put succinctly, after service of a Grand Jury subpoena on Ms. Witness, she and Mr. Target married hastily in a private civil ceremony. There was no advance notice to friends or family. The couple expected only one wedding present, the spousal privilege to block the new bride's Grand Jury testimony against her husband. As this Court sees it, the newlyweds are entitled to the nuptial gift they anticipated but in a size somewhat smaller than Mr. Target ordered.

For the foregoing reasons:

1. The Motion to Quash Grand Jury Subpoena filed by Ms. Witness is **DENIED** as to any testimony involving pre-marriage acts.

2. Ms. Witness shall appear before the Grand Jury at its next scheduled session.

    a. Ms. Witness shall testify as to all relevant events she perceived, and to all statements made to her, by her husband prior to her marriage.

    b. Ms. Witness need not testify as to events she perceived, or confidential communications made to her, by her husband after her marriage.