Joseph H. BRIDGES and Lillier J. Bridges, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 9054.

United States Court of Appeals Fourth Circuit.

Argued Oct. 4, 1963.

Decided Nov. 18, 1963.

Richard E. Thigpen and Robert L. Hines, Charlotte, N. C. (Richard E. Thigpen, Jr., Charlotte, N. C., on brief), for petitioners.

Giora Ben-Horin, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Gilbert E. Andrews, Attys., Dept. of Justice, on brief), for respondent.

Before HAYNSWORTH, BOREMAN and BRYAN, Circuit Judges.

BOREMAN, Circuit Judge.

This is an appeal from a decision of the Tax Court of the United States [1] disallowing as deductions for income tax purposes payments made by the taxpayers to certain lending institutions claimed by the taxpayers to constitute payments of interest on indebtedness within the intendment of section 163(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 163(a).[2] Upon a consideration of the evidence respecting the transactions involved the Tax Court found, as a matter of ultimate fact, that the transactions, insofar as they purported to constitute payments of interest on indebtedness, were shams and concluded, as a matter of law, that the amounts claimed by the taxpayers as interest payments are therefore not allowable as deductions.

There is no real dispute as to the details of the transactions and the findings of the Tax Court relating to such details are fully supported by the evidence. The only questions for determination upon this appeal are (1) whether the ultimate finding of the Tax Court (that, as

---

1. 39 T.C. 1064.

2. Internal Revenue Code of 1954
 Sec. 163. Interest.
 "(a) General Rule—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

payments of interest on indebtedness the transactions were shams) is sufficiently supported by the evidence; and (2) if so, whether the Tax Court correctly concluded that the claimed deductions are not allowable. If the transactions were shams, the answer to question (2) above is obvious. Transactions which are properly characterized as mere shams cannot be given effect for purposes of creating tax advantages, since in order to give that effect to the transaction it must be clear that what was done was, in reality, that which the statute intended. Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

Upon the particular facts of this case, we are of the opinion that the Tax Court's finding that as payments of interest on indebtedness the transactions here involved were shams is not only not clearly erroneous but is compelled when we apply the test set forth by the Supreme Court in Knetsch v. United States, supra.

The details of the two transactions involved herein are quite clearly and fully set forth in the opinion of the Tax Court. They will be briefly outlined here but the Tax Court's opinion should be read in connection herewith.

The appellants, taxpayers, are husband and wife and during the years involved, 1956 and 1957, resided in Charlotte, North Carolina. They filed joint federal income tax returns on a calendar year basis employing the cash method of reporting. Joseph H. Bridges was a financially successful business man who received and reported substantial amounts of ordinary income during the years involved and was in a very high tax bracket. Garvin, Bantel & Co. (hereinafter referred to as the broker) is a member of the New York and American stock exchanges with offices in New York City and is engaged in the business of buying and selling securities for its clients and arranging collateral loans for 200 to 300 commercial banks throughout the United States.

## FIRST TRANSACTION

On September 19, 1956, the broker, as principal and for its own account, sold Bridges $500,000.00 of United States Treasury 1⅝% notes due May 15, 1957, with the interest coupons *detached,* for the sum of $486,875.00. The settlement date was September 24, 1956, and the individual price for the notes was 97⅜ flat, which was less than the stipulated market price for such notes.

The broker arranged for the First National Bank of Baltimore, Maryland (hereinafter referred to as the Baltimore Bank), to make a loan to Bridges in the sum of $500,000.00, which loan was evidenced by a promissory note dated September 24, 1956, and signed by Mr. Bridges as maker. The note, according to its terms, was due and payable on May 15, 1957, the maturity date of the Treasury notes, and the $500,000.00 worth of Treasury notes were deposited with Chase Manhattan Bank, as custodian for the Baltimore Bank, as collateral security for payment of the $500,000.00 promissory note. The note recited that the borrower, Bridges, agreed to provide additional security if demanded and that, upon nonpayment, the bank would have broad powers to sell, collect or dispose of the collateral and that Bridges would be liable for any balance due on the note after application of the proceeds from the sale of the collateral. By check dated September 21, 1956, Bridges prepaid to the bank the stipulated interest on the loan in the sum of $19,687.50. On May 15, 1957, the Baltimore Bank redeemed the Treasury notes at maturity for $500,000.00 and extinguished Bridges' liability on the promissory note, which it canceled and returned to him on May 17, 1957, together with a notice acknowledging the receipt of payment of the note.

Except for the transmittal by the Baltimore Bank to Bridges of the canceled note and notice of payment, Bridges had absolutely no contact with the Bank concerning the loan, the entire transaction having been arranged by the broker. There was no refund by the Baltimore

Bank of any interest paid by Bridges in connection with the transaction.

On their joint return for 1956 the taxpayers reported an adjusted gross income of $95,582.95 and claimed a deduction for the $19,687.50 payment made to the Baltimore Bank as interest. On their joint return for 1957, the taxpayers reported a long-term capital gain in the sum of $13,125.00 as a result of the sale, on May 15, 1957, of the U. S. Treasury notes redeemed by the bank in repayment of the loan.

## SECOND TRANSACTION

On June 21, 1957, the broker sold Bridges $500,000.00 of United States Treasury 2¼% bonds, due June 15, 1962, for the sum of $463,557.89, for which sale the settlement date was June 24, 1957. As in the first transaction, the sale was made by the broker as principal and for its own account. The sale was made at the quoted price of 92²¹⁄₃₂, which appears to be approximately equal to the actual market value of the bonds on the date of the sale.

The broker arranged for the Bank of the Commonwealth, Detroit, Michigan (hereinafter referred to as the Detroit Bank), to make a loan to Bridges in the amount of $500,000.00, which loan was evidenced by Bridges' promissory note dated June 27, 1957, purporting to be due and payable approximately five years later on June 15, 1962, and secured by the $500,000.00 of U. S. Treasury bonds. It is significant that the due date of the promissory note was, similarly to the situation in the first transaction, identical to the date of maturity of the collateral. The promissory note given by Bridges in this transaction provided that "either party has the right to accelerate the maturity of this note after 1/24/58." Bridges prepaid interest on the loan in the sum of $48,281.25, none of which was ever refunded. While the bonds had the interest coupons attached, Bridges agreed that the bank could collect on the coupons, the proceeds of which were applied toward the interest payment. Pursuant to a prior grant of authority by Bridges

and an agreement on behalf of the Detroit Bank, the bank accelerated the maturity of the note on January 24, 1958, purchased the bonds being used as collateral at par ($500,000.00) and applied the proceeds to discharge Bridges' indebtedness. Here again, Bridges had no substantial direct contact with the bank respecting the transaction, the entire matter having been arranged and handled by the broker.

On their joint return for 1957, the taxpayers claimed a deduction for the amount paid to the Detroit Bank as interest in the sum of $48,281.25; and on their joint return for 1958 they reported a long-term capital gain in the sum of $36,442.11 on the sale, on January 24, 1958, of the $500,000.00 Treasury bonds.

As was found by the Tax Court, and as is clear from the testimony of Bridges himself, Bridges' only purpose in entering into each of the transactions involved was to create, by the payment of interest, a tax deduction and be able to report the profit accruing to him from the sale of the securities at their appreciated value as long-term capital gain, taxable at the relatively low rate to which such gains are subject. Furthermore, it is clear that Bridges did not expect, nor could he have expected, the excess of what would be received on the maturity of the Treasury notes or the resale of the Treasury bonds to exceed or even equal the amount of interest he prepaid on the respective loans. He entered into the transactions simply to make a profit after taxes. On the basis of these facts, the Tax Court found that as payments of interest on indebtedness the transactions were shams, with which conclusion we agree.

 It is clear, as was pointed out by the Tax Court herein, that a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by any means which the law permits. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L. Ed. 596 (1935). The test in such a case as the one under review here is not whether the motive or intent of the taxpayer in entering into the transaction

was, partially or solely, to decrease or avoid his taxes, but is "whether what was done, apart from the tax motive, was the thing which the statute intended." Knetsch v. United States, supra, 364 U. S. at 365, 81 S.Ct. at 134–135, 5 L.Ed. 2d 128; Gregory v. Helvering, supra, 293 U.S. at 469, 55 S.Ct. at 267–268, 79 L.Ed. 596. It is clear that what was intended by section 163(a) was to create a deduction for all interest paid or accrued on *indebtedness*. The question here is whether the payments made by Bridges to the banks were, in fact, interest, i. e., "compensation for the use or forbearance of money,"[3] paid with respect to a genuine indebtedness.[4]

Although the particular transaction involved in the case of Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L. Ed.2d 128 (1960), consisted of the purported purchase of an annuity contract with funds purportedly borrowed from the insurance company which "sold" the annuity contracts, the repayment of the "borrowed" funds being secured by the annuity contracts, the principles there laid down by the Supreme Court are not only applicable, but controlling, in the determination of the instant case.[5]

■■ The Court in Knetsch held that the tax reduction motive or intent is immaterial in such cases and that the determinative question as to "whether what was done, apart from the tax motive, was the thing which the statute intended" is answered in the negative if it is apparent "that there was nothing of substance to be realized by [the taxpayer] from [the] transaction beyond a tax deduction." There the Court concluded that it was clearly apparent that "Knetsch's transaction with the insurance company did 'not appreciably affect his beneficial interest except to reduce his tax.'" In view of such a finding, the Court held that the transaction was a sham and did not create an "indebtedness" within the intent of the interest deduction statute. Although the Court speaks in terms of what Knetsch, the taxpayer, actually got "for his out-of-pocket difference," it is clear from the opinion as a whole that, as the result might apply to situations generally, what the Court meant was not so much what the taxpayer ultimately gets for his outlay, but rather what are the *possibilities* in that regard under the terms of the specific transaction under consideration. We do not construe the Court to mean, nor do we intend to hold, that the transaction is a sham simply because it proves to be unprofitable and even though it results in a loss and a reduction of income tax liability. If there is, under the realities of the terms of the transaction, some reasonable hope of the transaction appreciably affecting the taxpayer's beneficial interest other than by tax reduction, the transaction would not be a sham for tax purposes. See Hanover Bank v. Commissioner, 369 U.S. 672, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962); Nassau Lens Co. v. Commissioner, 308 F.2d 39 (2d Cir. 1962); Maysteel Products, Inc. v. Commissioner, 287 F.2d 429

3. Deputy v. du Pont, 308 U.S. 488, 498, 60 S.Ct. 363, 368–369, 84 L.Ed. 416 (1940); Old Colony R. Co. v. Commissioner, 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484 (1932).

4. Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960).

5. In deciding the Knetsch case as it did, the Supreme Court settled a difference of views held by certain federal courts by expressly disapproving the decisions in United States v. Bond, 258 F.2d 577 (5th Cir. 1958), and Roderick v. United States, 59–2 U.S.T.C., § 9650,* 4 A.F.T.R.2d 5569 (W.D.Tex.1959),** reversed 290 F.2d 823 (5th Cir. 1961). These decisions had, in effect, held that despite the realities of a

transaction, if it appeared *in form* to be what the statute intended, i. e., interest paid on indebtedness, the claimed deduction was allowable. For other decisions where the transactions involved were somewhat similar to those in the instant case, i. e., the "purchase" of securities with funds obtained through "loans" and the pledge of the securities as collateral and where the courts followed and applied the principles stated in Knetsch, see Rubin v. United States, 304 F.2d 766 (7th Cir. 1962); MacRae v. Commissioner, 294 F. 2d 56 (9th Cir. 1961); Kaye v. Commissioner, 287 F.2d 40 (9th Cir. 1961).

* Commerce Clearing House.

** Prentice-Hall.

(7th Cir. 1961); Luden's, Inc. v. United States, 196 F.Supp. 526 (E.D.Pa.1961); Stanton v. Commissioner, 34 T.C. 1 (1960). Furthermore, if there is, under the realities of the terms of the transaction, some real risk of loss to the taxpayer, other than whatever loss might be actually "built-in" (as it was in the instant case), the transaction would not be a sham for tax purposes. See Humphreys v. Commissioner, 301 F.2d 33 (6th Cir. 1962); Fabreeka Products Company v. Commissioner, 294 F.2d 876 (1st Cir. 1961); Maysteel Products, Inc. v. Commissioner, supra.

In the instant case Bridges entered into two transactions, as to each of which he agreed to and did pay out substantially more money than he could even hope to recover from any increase in value of the securities he purchased. In other words, it is clear that there was no prospect whatever of any financial profit from the transactions alone. In neither case did he stand to gain on the over-all transaction due to a rise in the market price or value of the securities, nor did he risk any loss from a fall in the market price or value of the securities. In neither case did Bridges, *at any time*, have the uncontrolled use of additional money, of the securities he had purchased or of the interest on the securities. As was stated by the Tax Court, "we have been shown no way in which petitioner could have benefited economically from the transaction(s) except through a tax deduction." In fact, it was candidly admitted by Bridges under cross-examination that the only objective consideration involved in the transactions was the tax consideration. Since the maturity dates of the promissory notes and the securities were the same, the total amount of the "loans" was the same as the face amount of the securities at their maturity and Bridges had prepaid all the interest charged by the banks, there was never any benefit extended by the banks to Bridges and never any risk assumed by the banks. Assuredly, taxpayer did not receive money or equivalent economic benefits in the amount of the bank loans. Actually, no real indebtedness was created and the Tax Court was fully justified in finding that, as payments of interest "on indebtedness," the transactions were shams. Paraphrasing the language of the Supreme Court in Knetsch, it is patent that there was nothing of substance to be realized by Bridges from either transaction beyond a tax deduction; and plainly the transactions did not in any wise affect his beneficial interest except to reduce his tax.

Bridges relies quite heavily upon two Tax Court decisions: Clifford F. Hood, T.C.M. (Docket No. 84613), and L. Lee Stanton, 34 T.C. 1 (1960). The Stanton case is clearly distinguishable on its facts from the instant case. There the taxpayer borrowed his money from wholly independent sources and purchased the securities on the open market at the market price; it was conceded by the Commissioner that the transactions therein were entered into for profit, actually resulted in a profit (before taxes) and, except for the unexpected action of certain of the lending banks involved in refusing to return unearned interest, would have resulted in a substantially greater profit; and the decision to allow the claimed deductions was based on a finding of fact that the indebtedness there created was genuine. The Tax Court was itself badly split in Stanton, but it will be noted that the case was decided prior to and without the benefit of the decision of the Supreme Court in Knetsch. The reasoning of the Tax Court in the Hood case is not clearly disclosed in its memorandum opinion as it simply announced that the issue was resolved in favor of the taxpayer "on the authority of this Court's holding in L. Lee Stanton, 34 T.C. 1 (1960)," and without indicating that it was even aware of the decision in the Knetsch case which was handed down just a few months earlier.

Under the facts and circumstances of this case, we cannot say that the Tax Court erred in its findings and conclusions.

Affirmed.