**Joe T. BOYNTON and Helen J. Boynton, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 80–5069.

United States Court of Appeals, Fifth Circuit. Unit B

July 9, 1981.

Rogers & Meisel, Robert O. Rogers, David S. Meisel, Palm Beach, Fla., for petitioners-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, Appellate Sect., Richard W. Perkins, Daniel F. Ross, Attys., Tax Div., U. S. Dept. of Justice, N. Jerold Cohen, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent-appellee.

Before HILL, and FRANK M. JOHNSON, Jr., Circuit Judges, and SCOTT *, District Judge.

FRANK M. JOHNSON, Jr., Circuit Judge:

Joe T. Boynton[1] petitioned the United States Tax Court for a redetermination of federal income tax deficiencies totalling $203,487 assessed against him by the Commissioner of Internal Revenue [Commissioner] for calendar years 1971 through 1974.[2] The Tax Court, 72 T.C. 1147, found for the Commissioner and we consider Boynton's appeal under 26 U.S.C.A. § 7482. This appeal and that of *Holladay v. Commissioner*, 649 F.2d 1176 (5th Cir. 1981) (consolidated for oral argument and decided the same day) both involve the propriety of allocating all of the losses sustained by a partnership to one partner. Because we conclude that these allocations lacked substantial economic effect, we affirm.

I.  Facts

The facts are substantially undisputed. In February 1974, Boynton formed the Palm Beach Ranch Groves partnership in

---

* District Judge of the Middle District of Florida, sitting by designation.

1. Mrs. Helen J. Boynton is a party solely because she filed joint returns with her husband for the years at issue.

2. The only tax year at issue is 1974 as the deficiencies assessed for tax years 1971–73 are related to the 1974 return. The tax years 1971 and 1972 are involved solely because Boynton claimed a net operating loss carryback from 1974; the 1973 tax year utilized income averaging based on the revised 1971 and 1972 figures.

order to purchase and operate a citrus grove. Plimpton, who was to operate the grove, had a pre-existing agreement to purchase the 1,922.37-acre citrus grove located in Palm Beach County, Florida, at $1,600 an acre for a total price of approximately $3,075,635; he also agreed to reimburse the seller for expenses, pay for the fruit on the trees and pay a brokerage commission. However, Plimpton was unable to obtain institutional financing for this project without the participation of a financially strong individual such as Boynton who also had an agricultural background. Plimpton's contract for the purchase of the grove was assigned to the partnership. They agreed that the partnership would borrow the purchase money and initial working capital and thereafter each partner would equally contribute any additional funds that might be required to operate the grove.

They were able to borrow $3,000,000 from the John Hancock Mutual Life Insurance Company [John Hancock] and $500,000 from the First National Bank & Trust Company of Lake Worth [First National]. As security Boynton, Plimpton and their wives had to submit personal financial statements and agree to be jointly and severally liable for the repayment of the loans;[3] additionally Boynton also submitted a personal note worth approximately $725,000 as security for the First National loan. When the purchase was closed, the partnership had paid $3,075,632 for the land, $40,000 for the fruit on the trees, $85,500 for reimbursement of maintenance expenses, and $116,000 for the broker's commission with the balance of the $3,500,000 being used for working capital. This working capital was soon exhausted and the partners, utilizing one of Boynton's contacts, borrowed an additional $150,000 from the Production Credit Association. These funds were also quickly exhausted and Plimpton informed Boynton that more funds were needed to meet the grove's operating expenses. Boynton began making contributions to the partnership on the assumption that Plimpton would make matching contributions.

It became clear during June and July 1974 that the grove was not operating as profitably as projected mainly because the yield and the quality of the lemon crop were much poorer than expected.[4] Moreover Boynton became concerned with Plimpton's failure to contribute his share of the capital as required by the partnership agreement. Plimpton claimed he could not make his contributions within the near future because he had no financial resources to draw upon. Apparently one of Plimpton's businesses had been shut down by an Environmental Protection Agency order and one of his commercial properties worth approximately $370,000 was being foreclosed. The partnership needed at least $135,-000 in order to meet the October interest payment to John Hancock.

Boynton discussed the situation with their accountant, Everett Nowlen, who concluded that Plimpton's inability to carry his financial obligation was of a permanent or continuing nature; the accountant advised Boynton that the partnership agreement should be modified to reflect the fact that Boynton would be the sole supporter of the partnership for a period of time. On October 30, 1974, the partnership agreement was amended as follows: (1) whenever a partner made a greater contribution than the other, the amount of excess advances would be treated as a loan to the partnership (with a priority right of repayment from subsequent cash distributions); (2) only one partner at a time could have a credit balance in his loan account; (3) all of the federal tax losses of the partnership would be allocated to the partner with the credit balance in his loan account regardless of the actual amount in the credit balance; (4) the allocation of losses only affected the method of reporting losses (but not profits) for income tax purposes since for purposes oth-

---

3. The Boyntons reported $5,353,507 as their net worth for the John Hancock Loan and $7,353,-507 for the First National loan; the Plimptons reported $922,900 as their net worth on the first loan and $7,353,507 on the second loan.

4. The grove was planted with 800 acres of lemons and 800 acres of oranges. Apparently lemons do not grow well in Florida.

er than federal income taxes, the *prior provisions* that required an equal division of profits and losses remained in effect;[5] and (5) after all of the excess advances were repaid with interest, the original agreement was again in effect. *See* Appendix, Amended Partnership Agreement. Nowlen did not recommend and Boynton did not request a change in the allocation of overall economic profits or losses to give Boynton a greater economic share of the partnership to reflect his additional contributions as Boynton did not want to surrender his right of recoupment against Plimpton for the unmatched contributions should his economic situation turn around.

Both partners were satisfied that the modifications to the partnership agreement were fair under the circumstances. Boynton was aware of the tax benefits that the new loss allocation provision would provide him and he actively sought this tax advantage. Boynton would have continued to make monetary contributions to the partnership even without the tax incentive of the new loss allocation because of his personal liability for the partnership's obligations. During 1974, Boynton's capital contributions, which exceeded Plimpton's by $123,474.81, were reclassified as loans thus giving Boynton a credit balance in his loan account. Because of this credit balance, *all* of the partnership's taxable losses of $730,-592 were allocated to Boynton. On his 1974 return Boynton deducted $732,592 as his distributive share of the partnership's net losses; the Commissioner disagreed that Boynton could claim 100% of the partnership's losses and allowed Boynton only 50% of the partnership's losses or $366,296 as his distributive share. Boynton had also claimed that $59,366.02 was the net operating loss for 1974 and carried that loss back

to 1971 and 1972 for tentative refunds of $32,917 and $1,567. But because the redetermination of Boynton's distributive share eliminated the net operating loss for 1974, these tentative refunds had to be recaptured by the IRS. The Commissioner assessed deficiencies of $32,917 (1971), $1,567 (1972), $505 (1973) and $168,498 (1974) for a total of $203,487.

Boynton tried to sell the grove as early as the fall of 1974 but a bona fide offer of $3,570,000 for the grove (excluding the fruit) was not received until 1977. The fruit on the trees was put in a citrus pool for sale. Plimpton agreed to continue managing the grove for $1,900 per month but only if he received as additional compensation 100% of the profits from the citrus pool. The profits from the citrus pool were estimated at $15,000 to $30,000 but were much larger than expected. After the partnership liabilities were satisfied, excluding the money owed to Boynton, $85,000 to $90,000 remained from the citrus pool sale, which money was equally divided between Boynton and Plimpton. These funds were the only funds ever recovered by Boynton from the partnership. When the partnership was eventually terminated in 1978, Boynton's economic and tax losses were identical.[6]

## II. Interpretation of Boynton's Loss Allocation Under IRC § 704(a)

The sole issue before the Tax Court was whether the partnership's amended loss allocation provision under which Boynton claimed 100% of the partnership's 1974 taxable losses was a bona fide allocation of losses within the meaning of Section 704 of the Internal Revenue Code of 1954 [IRC], as amended, 26 U.S.C.A. § 704.[7] The Tax

---

**5.** This loss allocation did not affect the overall allocation of economic profits and losses or the amount of distributions available if a sale of the grove or dissolution of the partnership occurred.

**6.** After 1974 all excess advances were classified as contributions, *not* loans. The Tax Court noted that for the period 1974 through 1977 Boynton made unmatched contributions of $1,121,066.16 and that for the same period the

partnership's $1,191,186.78 losses were all allocated to Boynton. Boynton has not yet sought to enforce his right of contribution against Plimpton regarding the loans made; Plimpton feels he was under no obligation to repay any of the partnership losses.

**7.** Section 704 was amended by the Tax Reform Act of 1976, Pub.L.No.94–455, 90 Stat. 1520 (codified in scattered sections of 26 U.S.C.) but this amendment does not apply to the 1974

Court ruled against Boynton by finding that, since the 1974 amendment to the partnership provision did not in fact increase his "distributive share" of the partnership's profits and losses, the loss allocation was ineffective and Boynton could claim on his tax return only 50% of the partnership's losses. IRC § 704(a) provides that the formula selected by the partners for actually dividing the profits and losses will determine their distributive shares.[8] The Tax Court concluded that the amended partnership agreement lacked economic substance since it had no effect on the original agreement's overall distribution of profits and losses and had effect only for federal tax purposes.[9]

On appeal Boynton argues that the loss allocation had economic justification since without his funds the partnership could not have continued operations. In other words, the economic circumstance necessary to justify the allocation of all of the taxable losses to Boynton was the reasonably high probability that he would bear the economic detriment of any losses in light of Plimpton's inability to contribute financially. Moreover, Boynton contends that the Tax Court ignored the economic reality that he was the sole contributor by giving undue weight to Plimpton's business resiliency; the Tax Court emphasized Boynton's rights to recover against Plimpton should the latter's separate businesses recover.

■■■ It is axiomatic that only the partner who actually incurs a loss will be allowed a deduction for that loss. *See New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934).

Nor is there any dispute that if Boynton had contributed all of the partnership capital then the allocation of all of the partnership's taxable losses to him as the sole contributing partner would have been proper to reflect the fact that he bore the entire economic burden of any loss. *See, e. g., Harrell v. Commissioner*, 37 T.C.M. 911, 916 (CCH Dec. 35,201(M)) (1978); Treas.Reg. § 1.704-1(b)(2), Example 5 (1964). Boynton concedes that, if he had contributed money solely in exchange for tax benefits and Plimpton were able to satisfy his obligations regarding contributions, the allocation would lack economic reality and would be a sham. Transactions that have no economic effect other than the creation of income tax losses are shams for tax purposes and will not be recognized. *See Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

One of the primary issues in this case is what standard should be applied to the loss allocation involved to ascertain whether it was bona fide under IRC § 704. Under IRC § 702(a)(9)[10] taxable losses, so-called bottom line losses, are determined by reference to a partner's distributive share of the profits and losses as they were actually divided. Prior to the amendment of Section 704 it was unclear whether bottom line loss allocations were subject to IRC § 704(b)(2)'s tax evasion test which provided that, if the principal purpose of any allocation provision was the avoidance or evasion of any tax, the partners' agreement regarding their loss ratios would be ignored and the actual

---

taxable year at issue. All references will be to the original IRC § 704 unless otherwise indicated.

8. IRC § 704(a) states:
   A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement.

9. Amended Partnership Agreement, Article IV–4 Accounting
   § 4.44 The different allocations of profits and losses for tax purposes shall not affect or be considered as a part of the partnership accounting, the sole purpose of such differing

treatment being to allocate losses for tax purposes to the person who will suffer such losses in the event the partnership does not later make sufficient income to meet its obligations.

10. IRC § 702(a)(9) states:
    (a) General rule.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—
    (9) taxable income or loss, exclusive of items requiring separate computation under other paragraphs of this subsection.

distributive shares under Section 702(a)(9) would determine the taxable loss.[11] Under the regulations, the tax evasion/avoidance test essentially evolved into a substantial economic effect test. *See* Treas.Reg. § 1.704–1(b)(2).[12] *See generally* Kamin, *Partnership Income and Loss Allocations Before and After the Tax Reform Act of 1976*, 30 Tax Lawyer 667, 672 (1977); McKee, *Partnership Allocations in Real Estate Ventures: Crane, Kresser and Orrisch*, 30 Tax Law Rev. 1, 15–18 (1974) [McKee I].

■ However, the Commissioner does not argue that the statutory tax avoidance test under IRC § 704(b)(2) applied to Boynton's deduction; in fact, the Commissioner conceded in *Holladay* that Section 704(b)(2) did not apply to bottom line losses.[13] Rather the Commissioner argues that, when the allocation of all partnership losses to one partner does not affect the overall distribu-

tion of profits and losses, that allocation lacks economic substance under Section 704(a). In other words, the Commissioner looked past the form of the allocation to its substance in concluding that Boynton's loans could not justify his deduction of *all* of the partnership's losses in 1974. We agree.

Boynton chose to characterize his excess advances in 1974 as loans, not contributions; accordingly, if the loans were not repaid, Boynton could claim a deduction under the bad debt provision of the IRC the year the loans became worthless. He conceded that he expected repayment of his loan when it was initially made in 1974. The taxpayer is bound by the tax consequences of his choice in characterizing the excess advances as loans. *See Dixie Finance Co. v. United States*, 474 F.2d 501 (5th Cir. 1973). The Tax Court's factual finding that Boynton's rights of recovery against Plimpton were

---

11. IRC § 704(b)(2), the only statutory limitation on Section 704(a) states:

(b) Distributive share determined by income or loss ratio.—A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if—

\* \* \* \* \* \*

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

Treas.Reg. § 1.704–1(b)(1) (1964) states in part:

... [T]he manner in which the net profit or loss (computed after excluding any items subject to a recognized special allocation) is actually credited on the partnership books to the accounts of the partners will generally determine each partner's share of taxable income or loss as described in section 702(a)(9).

12. Treas.Reg. § 1.704–1(b)(2) provides in part that:

[T]he [partnership] provision must be considered in relation to all the surrounding facts and circumstances. Among the relevant circumstances are the following: Whether the partnership or a partner individually has a business purpose for the allocation; whether the allocation has "substantial economic effect," that is, *whether the allocation may actually affect the dollar amount of the partners' shares of the total partnership income*

*or loss independently of tax consequences*; whether related items of income, gain, loss, deduction, or credit from the same source are subject to the same allocation; whether the allocation was made without recognition of normal business factors and only after the amount of the specially allocated item could reasonably be estimated; the duration of the allocation; and the overall tax consequences of the allocation. (Emphasis added.)

13. Allocations of special items such as depreciation, capital gains and dividends were clearly covered by IRC § 704(b)(2). *See* IRC §§ 702(a)(1)–(a)(8). The main reason Congress amended Section 704 was to make it clear that bottom line losses were covered by Section 704(b)(2) and to formally recognize as a statutory provision the substantial economic effect test as stated by the Regulations and the case law. *See* McKee, Nelson & Whitmire, *Federal Taxation of Partnerships and Partners* [McKee II] § 10.01[2] (1977). The revised Section 704(b)(2) reads as follows:

(b) Determination of distributive share.—A partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances), if—

\* \* \* \* \* \*

(2) the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) does not have substantial economic effect.

not hopeless is supported by the record. Boynton seeks to have this Court treat Plimpton as a bankrupt yet Boynton made no effort to treat Plimpton as less than a full partner because of the possibility that Plimpton would recover from his economic reversals.[14] Plimpton's separate business did recover after the Environmental Protection Agency reversed its adverse ruling; moreover, Plimpton's October 10, 1973, financial statement reflected a net worth in excess of $900,000.

We are not convinced that Plimpton's unsupported assertion that he could not be held liable for the partnership's liabilities is sufficient to justify the loss allocation provision. The amended partnership agreement did not relieve Plimpton of his obligation to bear half of the economic losses that might be realized upon the sale of the grove or liquidation of the partnership. *See* Appendix, Article § 4.11. Accordingly, Boynton had a right of contribution against Plimpton under Florida Partnership law that was viable in 1974. *See* Fla.Stat.Ann. § 620.645(1) (1972). Although the events after 1974 do not affect the incidence of taxation at issue, it is interesting to note that Boynton and Plimpton equally divided the money from the citrus pool, the only funds ever recovered from the partnership.

Moreover, Boynton's 1974 loan was $123,474, yet he claimed $366,296 otherwise allocable to Plimpton in addition to the $366,296 loss deduction to which he was entitled. In other words, Boynton was the sole contributor only *after* the funds borrowed by both partners were expended yet he claimed *all* of the partnership losses on his individual return. Because the partnership's overall distribution of profits and losses remained unchanged by the amended loss allocation provision, we conclude that the allocation of all of the partnership losses to Boynton lacked economic effect. *See Sellers v. Commissioner*, 617 F.2d 1042,

1043, 1044 (4th Cir. 1980); *Kresser v. Commissioner*, 54 T.C. 1621 (1970). In *Kresser* the Tax Court stated that an allocation of partnership bottom line losses under IRC § 704(a) is bona fide only if that allocation accurately reflects the economic basis upon which the partners agreed to share the profits and losses. *Id.* at 1630–31.[15] If Boynton had instead received loss allocations in proportion to his excess advances as opposed to loss allocations for the partnership's total losses claimed in 1974, the amended agreement may have been sustained. *See Miller v. Commissioner*, 285 F.2d 843 (10th Cir. 1960). The amended partnership agreement did not in fact increase Boynton's distributive share or decrease Plimpton's distributive share of the partnership's profits and losses, thus the allocation of all of the partnership's 1974 losses to Boynton was ineffective and he was not entitled to claim more than 50% of the partnership's 1974 losses. Accordingly, the Tax Court's decision is AFFIRMED.

### APPENDIX

The Amended Partnership Agreement provides in part:

WHEREAS, the partnership is in need of cash funds to meet its obligations; and

WHEREAS, Boynton is willing to supply such funds by way of loans to the partnership, but only if he receives the benefit of all partnership losses, until such time as all funds have been returned; and

\* \* \* \* \* \*

### ARTICLE IV–1 PROFITS AND LOSSES

4.11 Except as otherwise provided for determining each partner's share of the partnership income and loss for purposes of the federal income tax, all profits and losses of the partnership shall be allocated equally between the two partners.

---

**14.** Boynton claims that in 1974 he did not think that he would *ever* recover his cash advances from Plimpton and that the most he hoped for was that the land would increase in value to allow him to recoup some of his losses upon its sale.

**15.** *Kresser's* holding that the transaction involved therein lacked a substantial economic effect did not rely on IRC § 704(b)(2).

4.12 Notwithstanding the provisions of Section 4.11 hereof, the partners recognize that Boynton will be required to make cash available to the partnership from time to time until such time as it shows a positive cash flow; and that Boynton is the individual to whom the institutional lenders will look for a repayment of the partnership loans if they cannot be satisfied out of partnership funds.

Because of the foregoing, the allocation between them of profits and losses for tax purposes, but not for the purpose of determining their share of distributions (which shall be governed by Section 4.11 hereof), shall be as follows:

(a) The taxable income and/or loss of the partnership under the governing provisions of the Internal Revenue Code of 1954 shall be determined; then

(b) As long as there is a credit balance in either partner's loan account, all losses shall be allocated to such partner;

(c) Gains from the sale of any asset with respect to which the partnership has claimed depreciation, shall be allocated to the partner who received the tax benefit from such depreciation to the extent of the lesser of such depreciation or the amount of gain; and

(d) All other income, gains, profits, and for any year in which there is no balance in either partner's loan account as of the end of such year, losses, shall be allocated in accordance with the ratio for sharing profits and losses.

## ARTICLE IV-2  CAPITAL AND LOANS

4.21 The partners may from time to time make advances to the partnership. To the extent such advances are equal, the amounts thereof shall be credited to each partner's capital account.

4.22 The amounts by which the total net advances made by one partner exceed the total net advances made by the other partner, shall be treated as loans to the partnership by the partner making such excess advances; and shall bear interest

at the rate of nine (9%) percent per annum. Such interest shall be paid as funds are available.

## ARTICLE IV-3  DISTRIBUTIONS

4.31 From time to time, the partnership shall distribute to its partners, in proportion to their interest in partnership profits and losses, all of its available cash. All such distributions shall be made to and among the partners and divided among them on the basis of their respective interests in the profits of the partnership, and no cash distributions shall be made to any partner except in repayment of loans and/or interest thereon, unless a proportionate amount, according to their respective interests in the partnership profits, is distributed to the other partner.

\*      \*      \*      \*      \*      \*

4.33 No cash shall be considered available until all amounts advanced by a partner and treated as loans have been repaid; it being understood that all advances treated as loans and the interest thereon are to be repaid before any cash distributions are made to the other partner.

## ARTICLE IV-4  ACCOUNTING

4.41 The partnership shall maintain a capital, loan, drawing, and income account for each partner.

4.42 The income account of each partner shall be debited or credited with such partner's share of the profits and losses allocated in the manner specified in section 4.11 hereof.

4.43 All advances by the partners to the partnership shall be treated in the manner specified in Article IV-2 hereof. All distributions to a partner shall be treated as repayments of a partner's loans to the extent thereof, and any excess shall be charged to such partner's drawing account.

4.44 The different allocations of profits and losses for tax purposes *shall not effect* (sic) [emphasis added] or be considered as a part of the partnership

accounting, the sole purpose of such differing treatment being to allocate losses for tax purposes to the person who will suffer such losses in the event the partnership does not later make sufficient income to meet its obligations.