H. David BOYTER and Angela M. Boyter, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE, Appellee.

No. 80–1792.

United States Court of Appeals, Fourth Circuit.

Argued May 4, 1981.

Decided Dec. 30, 1981.

Paula M. Junghans, Baltimore, Md. (Marvin J. Garbis, Garbis & Schwait, P.A., Baltimore, Md., on brief), for appellants.

James A. Riedy, Tax Div., Dept. of Justice, Washington, D.C. (John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Richard Farber, Tax Div., Dept. of Justice, Washington, D.C., on brief), for appellee.

Before WINTER, Chief Judge, and RUSSELL and WIDENER, Circuit Judges.

WINTER, Chief Judge:

Taxpayers (H. David Boyter and his sometime wife, Angela M. Boyter), both of whom are domiciled in Maryland, ask us to

reverse the Tax Court and to rule that for the tax years 1975 and 1976 they successfully avoided the "marriage penalty" of the Internal Revenue Code. The "marriage penalty" results from the fact that a man and woman who are husband and wife on the last day of the taxable year, each having separate income, are taxed, in the aggregate, in a greater amount if they file either joint or separate income tax returns than would be the case if they were unmarried.[1] The Tax Court ruled that the Boyters were legally married at the end of tax years 1975 and 1976, and therefore were subject to the higher tax rate, since their purported Haitian and Dominican Republic divorces (granted on December 8, 1975 and November 22, 1976, respectively) were invalid under the law of Maryland, the state of the Boyters' domicile. The Tax Court therefore sustained the Commissioner's deficiency assessments for unpaid taxes. In view of this conclusion the Tax Court apparently thought it unnecessary to decide the Commissioner's alternative argument that even if the divorces would be recognized in Maryland, the taxpayers should be treated as husband and wife for federal income tax purposes under the "sham" transaction doctrine.

Without expressing a view on the correctness of what was actually decided, we remand the case to the Tax Court for further findings as to the applicability of the sham transaction doctrine.

## I.

Taxpayers were married in Maryland in 1966 and were domiciled in Maryland during the tax years in issue, 1975 and 1976. Both are employed as federal civil service employees and have not insubstantial earnings. They filed joint federal income tax returns and reported their income as married individuals filing separately from 1966 to 1974.

Probably as a result of dinner table conversation with a friend who had been recently divorced, taxpayers came to the realization that their combined federal income tax liability would be lower if they were able to report their respective incomes as unmarried individuals. They were also

---

1. A clear and precise explanation of the phenomenon of the "marriage penalty" is contained in the Tax Court's opinion in the instant case:

> A married couple filing a joint return is taxed on their total combined income and, as for all taxpayers, the marginal tax rate increases as total income increases. Reflecting income splitting enacted in 1948, the rate schedule for married couples filing jointly is somewhat lower than it is for single persons. Consequently, if one partner of the marriage produces all or most of the income, he or she pays less tax than if single. However, if both spouses work, the second income is piled on the first, and is thus in a higher marginal tax bracket than if it stood alone. Because the higher tax bracket can more than negate the lower rate schedule for couples filing jointly, when two people who earn somewhat comparable salaries decide to marry, they unhappily discover that their total tax bill is higher than it was before they were wed.

As a footnote to this explanation, the Tax Court added the following additional explanation:

> We should add that if they continue to file separate returns, they can no longer use the rates applicable to single individuals, but must use still another schedule with higher rates applicable to married individuals filing separate returns. Undoubtedly, all this confusion is a bit bewildering to the average citizen who may assume that simple justice and administrative convenience would be best served by taxing income to the individual who earns it pursuant to one rate schedule uniformly applicable to all. Indeed, this was the rule for a considerable period of time after the income tax was enacted, and a substantial effort was made to prevent its erosion. See *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); and *Helvering v. Eubank*, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81 (1940) (preventing the deflection by a husband to a wife of a part of his future earnings; and preventing deflection of earnings from services previously rendered.) Nevertheless, Congress through the years responded to a variety of problems on an *ad hoc* basis, and we now have still another problem, the "marriage penalty." For a good introduction to the problem of the marriage penalty, see Gerzog, "The Marriage Penalty: The Working Couple's Dilemma," 47 Fordham L.Rev. 27 (1978). An in-depth discussion of the problems presented is found in Bittker, "Federal Income Taxation and the Family," 27 Stan.L.Rev. 1389, 1416–1444 (1975).

*H. David Boyter* 74 T. C. 989 (1980).

aware that the Internal Revenue Code provides that the determination of whether an individual is married shall be made as of the close of the taxable year. 26 U.S.C. § 143(a)(1).

Taxpayers thus concluded that if they obtained a divorce decree at the end of the taxable year (here, December 31) they would be entitled to file their returns as unmarried individuals. It seems clear, as the Tax Court found, that at least through 1976 taxpayers never intended to and never did physically separate from each other prior to or subsequent to either of the divorces that they obtained. Rather, they continued to reside together through the tax years in question in the home they purchased in 1967.

Late in 1975 taxpayers traveled to Haiti. Through an attorney, whose name they had obtained from a Baltimore public library and who in correspondence had quoted them an attractive estimate of his fee and expenses, they obtained a decree of divorce. The action was instituted by Angela Boyter and the divorce decree was granted on the ground of incompatibility of character notwithstanding that the parties occupied the same hotel room prior to and immediately after the granting of the decree. Moreover, Angela Boyter testified before the Tax Court that her character was not incompatible to that of David Boyter. She testified also that the sole reason for her obtaining the divorce was "because the tax laws, as currently written, caused us to pay a penalty for being married." Indeed she testified that she advised her Haitian counsel "that we got along quite well and planned to continue to live together ..."[2] Shortly

after the Haitian court granted the divorce, taxpayers returned to their matrimonial domicile in Maryland and were remarried in Howard County, Maryland on January 9, 1976. For the calendar year 1975 taxpayers filed separate income tax returns claiming the rates applicable to unmarried individuals.

In November of 1976 taxpayers traveled to the Dominican Republic where David Boyter, as the moving party, obtained a divorce decree on November 22, 1976. Again the parties traveled together to and from the Dominican Republic. Whether they occupied the same hotel room is not shown by the record. The record does show, however, that although the Dominican decree was granted on the ground of "incompatibilities of temperaments existing between [the parties] that has made life together unbearable," Angela Boyter denied that she had ever said anything which would serve as a basis for such a finding by the Dominican Republic court. David Boyter testified before the Tax Court that he would not characterize the grounds as "totally" true. As he explained it: "I understood that these were strictly legalistic terms."

The taxpayers returned to Maryland to their matrimonial domicile and they were remarried on February 10, 1977. For calendar year 1976 they filed separate federal income tax returns claiming the rates applicable to unmarried individuals.

The Commissioner determined a deficiency in income taxes for each of the taxpayers for 1975 and 1976 and taxpayers sought review in the Tax Court. The Tax Court

---

**2.** The perspective in which the Boyters viewed their purported divorce further appears in the following testimony of Angela Boyter:

Q. You testified that you intended to be divorced, I think I understood you as saying, for all purposes of divorce even though your motivation was for purposes of tax reduction. Is that correct?

A. For all legal purposes, yes.

Q. Did you intend to physically separate from your spouse?

A. No.

Q. Did you continue to cohabit with your spouse throughout the period?

A. To what?

Q. Cohabit. Live together.

A. I suppose so, yes.

Q. You suppose so? You did? Is that correct?

A. Yes.

Q. Okay. Did you intend to separate your finances with respect to savings and checking accounts?

A. No.

Q. Investments?

A. Only in the kinds of property separations that automatically happen when you get divorced.

sustained the deficiencies. Although the government argued that the divorce decrees should be disregarded for federal income tax purposes because a year-end divorce whereby the parties intend to and do in fact remarry early in the next year is a sham transaction, the Tax Court expressed no view on this argument. Rather, it undertook an elaborate analysis of Maryland law with respect to the validity of the divorce decrees and concluded that Maryland would not recognize the foreign divorces as valid to terminate the marriage. On this basis, the Tax Court entered judgment for the government.

## II.

■ We agree with the government's argument that under the Internal Revenue Code a federal court is bound by state law rather than federal law when attempting to construe marital status. *Eccles v. Commissioner*, 19 T.C. 1049, *aff'd*, 208 F.2d 796 (4 Cir. 1953). The difficulty with this approach in this case, however, is that the Maryland authorities do not establish beyond peradventure of doubt that the two divorces with which we are concerned are invalid under Maryland law. As the Tax Court stated, "the law in Maryland with regard to the recognition of migratory divorces obtained in a foreign country by Maryland domiciliaries has not been explicitly declared by either the legislature or the highest court of that state," although, as the taxpayers have demonstrated, a number of Maryland trial courts, explicitly and implicitly, have recognized the validity of migratory foreign divorces.

In this ambiguous state of the Maryland law, we would ordinarily be disposed to invoke the certification procedure authorized by Ann.Code of Md., Cts. & Jud.Proc.

§ 12–601 (1980), and ask the Maryland Court of Appeals for a definitive pronouncement on the validity of these bilateral foreign migratory divorces.[3]

But there are other factors which must be considered. The Commissioner has made it clear to us both in his brief and in oral argument that he intends to press the contention, advanced in the Tax Court but not decided by it, that under the sham transaction doctrine taxpayers must be treated as husband and wife in computing their federal income taxes for the years 1975 and 1976 even if Maryland recognizes the validity of their migratory foreign divorces.[4] Of course, if the issue of their validity were certified to the Maryland Court of Appeals and that court ruled them invalid, that decision would decide this case. Significantly, however, if the Maryland Court of Appeals ruled them valid, further proceedings would still be necessary in a federal tribunal and those proceedings might result in an adjudication which would render the certification and the opinion of the Maryland court a futile, academic exercise with respect to final disposition of this case.

■ We think that certification is inappropriate here. Considerations of comity lead us to conclude that we ought not to request the Maryland Court of Appeals to answer a question of law unless and until it appears that the answer is dispositive of the federal litigation or is a necessary and inescapable ruling in the course of the litigation.[5] Certainly we have discretion as to whether to employ the Maryland certification procedure. *Lehman Brothers v. Schein*, 416 U.S. 386, 390–91, 94 S.Ct. 1741, 1743–44, 40 L.Ed.2d 215 (1974); *Barnes v. Atlantic & Pacific Life Insurance Co.*, 514 F.2d 704, 705 n.4 (5 Cir. 1975). *See general-*

---

**3.** This option was not available to the Tax Court because the Maryland statute does not permit a certification from that tribunal.

**4.** As we shall show in the text, *infra*, the issue of whether the divorces should be disregarded for federal income tax purposes under the sham transaction doctrine is a substantial one, albeit one we do not presently decide.

**5.** The highest courts in some other jurisdictions having certification procedures have taken the

position that they will not respond to a certified question where the answer may be nothing more than an advisory opinion. *See* 17 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4248 at 526–28 (1978). We express neither approval nor disapproval of that position, and we make no recommendation to the Maryland Court of Appeals. We do think, however, that federal courts should take care not to burden their state counterparts with unnecessary certification requests.

*ly Florida ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266, 274–75 (5 Cir.), *cert. denied sub. nom., Standard Oil Co. of California v. Florida ex rel. Shevin,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976). We hold that that discretion ought not to be exercised to certify a question of state law where a question of federal law is present and undecided, the decision of which may be wholly dispositive of the case.

### III.

We therefore turn to the question of whether in principle the sham transaction doctrine may be dispositive in this case. Although we hold that the doctrine *may* be applicable, we do not decide that the divorces in question are in fact shams.

The sham transaction doctrine has its genesis in *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). There, a taxpayer wished to effect the distribution to herself of stock of Monitor Securities Corporation, which was owned by United Mortgage Corporation of which she was the sole stockholder, without paying the tax which would apply to a direct transfer of Monitor's stock as a dividend from United. Strictly in accordance with the letter of the law, she sought to effect a tax-free reorganization of United whereby United transferred the Monitor stock to a new corporation, owned solely by taxpayer, and promptly liquidated the new corporation, distributing the stock to her. She then sold the stock, contending that she owed taxes only for the capital gain that she had realized.

The Court conceded that the reorganization was conducted in technical compliance with applicable statutes and that taxpayers are entitled to arrange their affairs so as to decrease their tax liability. It held nonetheless that the "whole undertaking ... was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization" and should be disregarded for income tax purposes. 293 U.S. at 470, 55 S.Ct. at 268. The Court relied on the fact that the transaction had no business or corporate purpose—that it was "a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, ... the sole object of which was the consummation of a preconceived plan, not to reorganize a business, or any part of a business, but to transfer a parcel of corporate shares to [taxpayer]." *Id.* at 469, 55 S.Ct. at 267. The Court concluded: "The rule which excludes from consideration the motive of tax avoidance is not pertinent to this situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." *Id.* at 470, 55 S.Ct. at 268.

*Gregory* has been subsequently invoked by the courts to disregard the form of a variety of business transactions and to apply the tax laws on the basis of the substance or economic reality of the transactions. For example, in *Commissioner v. Tower,* 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670 (1946), the Court disregarded the formation of a partnership between a husband and a wife when its sole purpose was to divert income properly attributable to the husband to the wife and thus reduce the couple's overall tax burden. Similarly, in *Helvering v. Clifford,* 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940), the Court held that a husband could not escape tax liability on the income from a portfolio of securities by placing it in a trust for his wife's benefit while retaining in himself substantial dominion and control over the trust. In *Higgins v. Smith,* 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940), the taxpayer was not permitted to claim a tax deduction for loss on the sale of securities to a corporation wholly owned by him. *See also Griffiths v. Helvering,* 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319 (1939). As the Court stated in *Minnesota Tea Co. v. Helvering,* "A given result at the end of a straight path is not made a different result because reached by following a devious path." 302 U.S. 609, 613, 58 S.Ct. 393, 82 L.Ed. 474 (1938).[6]

---

**6.** *See also Boynton v. Commissioner,* 649 F.2d 1168, 1172–74 (5 Cir. 1981); *accord, Sellers v.* *United States,* 617 F.2d 1042, 1045 (4 Cir. 1980) (allocation of partnership losses among family

In evaluating the substance of .a transaction, the courts take care to examine the transaction as a whole, not as the sum of its component parts. Accordingly, the liquidation of a corporation will be disregarded when it reincorporates subsequently and the business enterprise remains in substantially continuous operation. *Atlas Tool Co. v. Commissioner*, 614 F.2d 860, 866–67 (3 Cir. 1980); *accord, Rose v. United States*, 640 F.2d 1030 (9 Cir. 1981); *cf. Pridemark, Inc. v. Commissioner*, 345 F.2d 35, 41 (4 Cir. 1965) (enterprise not continuous where business suspended for a year), *overruled in different part, Of Course, Inc. v. Commissioner*, 499 F.2d 754 (4 Cir. 1974). In addition, as the Supreme Court has stated, "Tax consequences follow what has taken place, not what might have taken place." *Central Tablet Mfg. Co. v. United States*, 417 U.S. 673, 690, 94 S.Ct. 2516, 2526, 41 L.Ed.2d 398 (1974). Benefits under the tax laws are thus not available on the basis of hypothetical contingencies. *See Knetsch v. United States*, 364 U.S. 361, 365–68, 81 S.Ct. 132, 134–36, 5 L.Ed.2d 128 (1960).

Although the sham transaction doctrine has been applied primarily with respect to the tax consequences of commercial transactions, personal tax consequences have often served as the motive for those transactions. *E.g., Tower*, 327 U.S. at 289, 66 S.Ct. at 536. *Clifford*, 309 U.S. at 333–36, 60 S.Ct. at 555–57. The principles involved, moreover, are fundamental to the system of income taxation in the United States and should be applicable generally. As Judge Learned Hand, the author of the *Gregory* opinion in the Court of Appeals, noted:

> The question always is whether the transaction under scrutiny is in fact what it appears to be in form; a marriage may be a joke; a contract may be intended only to deceive others; an agreement may have a collateral defeasance. In

such cases the transaction as a whole is different from its appearance. True, it is always the intent that controls; and we need not for this occasion press the difference between intent and purpose. We may assume that purpose may be the touchstone, but the purpose which counts is one which defeats or contradicts the apparent transaction, not the purpose to escape taxation which the apparent, but not the whole, transaction would realize. In *Gregory v. Helvering*, . . . , the incorporators adopted the usual form for creating business corporations; but their intent, or purpose, was merely to draught the papers, in fact not to create corporations as the court understood that word. That was the purpose which defeated their exemption, not the accompanying purpose to escape taxation; that purpose was legally neutral. Had they really meant to conduct a business by means of the two reorganized companies, they would have escaped whatever other aim they might have had, whether to avoid taxes, or to regenerate the world.

*Chisholm v. Commissioner*, 79 F.2d 14, 15 (2 Cir. 1935) (citation omitted). Thus Revenue Ruling 76–255 applies the sham transaction doctrine to the divorce of taxpayers who promptly remarry. The underlying purpose of the transaction, viewed as a whole, is for the taxpayers to remain effectively married while avoiding the marriage penalty in the tax laws. It is the prompt remarriage that defeats the apparent divorce when assessing the taxpayers' liability, just as the prompt reincorporation of a business enterprise in continuous operation defeats the apparent liquidation of the predecessor corporation. *Atlas Tool Co.*, 614 F.2d at 866–67. Thus, the sham transaction doctrine may apply in this case if, as the record suggests, the parties intended merely to procure divorce papers rather than actually to effect a real dissolution of their marriage contract.[7]

members disregarded as sham); *Haberman Farms, Inc. v. United States*, 305 F.2d 787 (8 Cir. 1962) (family corporation disregarded as device to absorb family income); *cf. Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) (sale-lease-back transaction upheld where third-party par-

ticipant assumed actual risks, not merely a conduit).

7. Relevant to their intention is the evidence suggesting that they may have practiced fraud upon the tribunals granting the divorces.

Having decided in principle that the sham transaction doctrine may apply to the conduct of the parties, we make no finding that the conduct in fact constituted a sham. In our view, the Tax Court as the trier of fact is the only body competent to make that determination in the first instance.

It is generally held that whether a transaction lacks real substance and thus constitutes a sham is a question of fact reviewable only under the clearly-erroneous standard. *See Commissioner v. Court Holding, Inc.,* 324 U.S. 331, 333–34 (1945); *Thompson v. Commissioner,* 631 F.2d 642, 646 (9 Cir. 1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981); *Weisbart v. Commissioner,* 564 F.2d 34–36 (10 Cir. 1977); *Bridges v. Commissioner,* 325 F.2d 180 (4 Cir. 1963). It is the Tax Court which "has the primary function of finding the facts in tax disputes, weighing the evidence, and choosing from among conflicting inferences and conclusions those which it considers most reasonable." *Commissioner v. Scottish American Investment Co.,* 323 U.S. 119, 123–24, 65 S.Ct. 169, 171, 89 L.Ed. 113 (1944). Indeed, *Scottish American* also admonishes us that we have "no power to change or add to these findings of fact or to reweigh the evidence." *Id.* at 124, 65 S.Ct. at 171.

In summary, we conclude that the correctness of the Tax Court's basis of decision cannot be determined under the present state of Maryland law without certifying the precise question to the Maryland Court of Appeals. Certification should not now be undertaken because there is present and undecided a federal issue which may be dispositive of the litigation, and it is proper that the federal issue be decided before certification is made. The sham transaction doctrine is not inapplicable to this case as a matter of law, but whether the two divorces with the subsequent marriages were shams for income tax purposes are questions of fact which must be determined by the Tax Court and not by us in the first instance.

Accordingly we remand the case to the Tax Court to determine whether the divorces, even if valid under Maryland law, are nonetheless shams and should be disregarded for federal income tax purposes for the years in question.

REMANDED.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

I think the Tax Court had the proper thought in mind when it treated the case as one under Maryland law. I express no opinion on the correctness of the Tax Court's decision that the divorces in question were invalid under Maryland law, but note, as does the majority, that various inferior Maryland courts have held similar divorces obtained in foreign countries to be valid.

I think the case should be certified to the Maryland courts under the applicable statutes of that State. This case presents a classic opportunity to take advantage of the certification procedure permitted by the statutes of various states, including Maryland, so that we may actually decide a case at hand instead of deciding as we are bound to do what the opinion of a State court of last resort would be, *Commissioner v. Estate of Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), or upon an assumption as we do here.

Whether or not a divorce may be a sham transaction under federal tax law in the face of a ruling by a State court of competent jurisdiction that the very divorce in question is valid is a question of first impression. This court now answers that question in the affirmative without even permitting the Tax Court an opportunity to rule on the question in the case at hand, and without considering applicable Supreme Court and circuit precedent.

I think the necessity of obtaining a ruling from the Maryland court is evident from the opinion of the majority itself, with only little outside reference needed.

It is only simple logic to say that a divorce which is not a sham under Maryland law would have harder going when sought to be treated as a sham under federal tax law, if indeed that is possible at all.

My thought is expressed in the *Chisholm* case so heavily relied upon by the majority and indeed is a part of the very quotation relied upon in the majority opinion. It is:

"We may assume that purpose may be the touchstone, but the purpose which counts is one which defeats or contradicts the apparent transaction, not the purpose to escape taxation which the apparent, but not the whole, transaction would realize." 79 F.2d at 15.

The same thought has been expressed in this circuit in *Bridges v. C.I.R.*, 325 F.2d 180 (4th Cir. 1963).[1] *Bridges* construed *Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). Because *Bridges* has not been overruled or modified by an en banc court, it is the law in this circuit. *Knetsch* I take to be one of the leading cases on the subject at hand.

*Knetsch* involved claimed payments of interest as deductions. The Court held that the interest payments were sham because there was in reality no principal indebtedness. At page 365, 81 S.Ct. at page 134, it stated the rule in such cases:

"But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."

In *Bridges* we held that the rule from *Knetsch*, just above quoted, was "the determinative question," 325 F.2d at 184, and went on to explain "If there is, under the realities of the terms of the transaction, some reasonable hope of the transaction appreciably affecting the taxpayers' benefi-cial interest other than by a tax reduction, the transaction would not be a sham for tax purposes. [Citations omitted] Furthermore, if there is, under the realities of the terms of the transaction, some real risk of loss to the taxpayer, other than whatever loss might be actually built in (as it was in the instant [*Bridges*] case), the transaction would not be a sham for tax purposes." 325 F.2d at 184–185.

As the language I have quoted from *Chisholm, Knetsch* and *Bridges* illustrates, the ascertainment of the validity of the divorce is necessary in determining "whether what was done, apart from the tax motive, was the thing which the statute intended."

I find it remarkable that the majority does not even mention *Knetsch* in its opinion, and even more remarkable that it does not mention *Bridges* in connection with the rule to be followed in deciding such cases, its only mention of *Bridges* being with reference to the clearly erroneous standard.

If the majority had simply remanded to the Tax Court, I would have less objection to the opinion. The remand, however, has unnecessarily, and I think unreasonably, restricted the decision of the Tax Court on remand. That court may not now decide because of our preemption whether a divorce may be a sham in the face of a State court decision that it is valid, which, after all, is the most important aspect of the case.

---

1. *Bridges* involved the deliberate payment of interest, in excess of the profit realized in trad-ing on Treasury notes and bonds, in order to make a profit after taxes. 325 F.2d 182, 183.